**MOUNTAIN FUEL SUPPLY COMPANY,**
a Utah corporation, Plaintiff,

v.

**SHELL OIL COMPANY, a Delaware corporation, and Gary Energy Corporation, a Colorado corporation, Defendants.**

No. C 76–80.

United States District Court,
D. Utah, C. D.

Oct. 1, 1981.

Robert S. Campbell, Jr., and Glen E. Davies, Watkiss & Campbell, Salt Lake City, Utah, for plaintiff.

Leonard J. Lewis, E. Scott Savage, and Alan L. Sullivan, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for defendant Shell Oil Co.

Albert J. Colton and Anthony L. Rampton, Fabian & Clendenin, Salt Lake City, Utah, for defendant Gary Energy Corp.

## ORDER OF REMAND

ALDON J. ANDERSON, Chief Judge.

The above-entitled case was removed to this court from the Third Judicial District Court for Salt Lake County, State of Utah, by defendant Shell Oil Corporation (Shell) on March 16, 1976. The petition for removal, plaintiff's second amended complaint, and defendants' counterclaims presume diversity jurisdiction is proper under 28 U.S.C. § 1332, and that procedural relief is available under 28 U.S.C. § 1441 *et seq.* This court is of the opinion that pursuant to 28 U.S.C. § 1441(c) the substantial issues of this case should be remanded to state court for lack of jurisdiction under the Johnson Act, 28 U.S.C. § 1342. If there are issues not governed by the Johnson Act it is manifest that comity requires that they also be remanded.

## FACTUAL BACKGROUND OF THE INSTANT CASE

Plaintiff Mountain Fuel Supply Company (MFS) is a Utah corporation and a public utility that supplies natural gas to the residents of Utah under the supervision of the Utah Public Service Commission (UPSC). Defendant Shell Oil Company (Shell) and Gary Energy Corporation (Gary) supply part of MFS's natural gas needs from intrastate production in the Bluebell-Altamont oil fields of the Uintah Basin. The gas is supplied under contracts which, as amended, include favored nation clauses allowing the price of natural gas sold to be raised to a "higher rate," as allowed by the Federal Power Commission (FPC) or other proper governmental authority for sales "in the same area" in interstate commerce. The controversy in this case focuses on three basic pricing questions and related issues which have arisen since the approval of these contracts, as amended, by the parties and the UPSC. First, for the period from April 16, 1974, to June 21, 1974, we are principally concerned with the application of a contract clause which allowed a seller to increase the price of natural gas when another buyer "in the area" purchased gas at a higher price. Shell and Gary rely on interstate FPC definitions to claim the term applies to that market. MFS contends it was to have been restricted to the area in which the intrastate gas was delivered and therefore had nothing to do with the definitions of area used by the FPC. Second, the FPC at various times established maximum prices and approved the concept of vintaging gas with differing price levels in its opinions numbered 699, 699D, 699H, 742, 770 and 770A. There is a dispute between the parties as to whether these FPC regulated prices under the favored nation clauses required the sale of intrastate gas at the maximum price allowed in light of the established vintaging levels, or the maximum allowed for any gas sold, regardless of vintaging. Also, Shell and Gary claim that the contract and FPC opinions also allowed the upward adjustment of the maximum price to include all state ad valorem, occupation and conservation taxes from June 21, 1974, to November 30, 1978. Third, effective December 1, 1978, the National Gas Policy Act, 15 U.S.C. § 3301 *et seq.* (1978) allowed sellers "in the same pricing area" to collect the Section 102 price plus the Section 110 adjustments for all "state severance taxes and certain production related costs." Shell and Gary claim the right to collect the same under the favored nation clause. Gary has asked under V–5 of its contract for additional amounts due because of an increase in the Utah occupation and conservation taxes. Also, Gary claims that under paragraph V–4 of the contract sales by Shell and Koch to MFS in the area of concern escalated its entitlement to an increase in the price in said sales since that time (July

5, 1972). In addition, Shell and Gary have requested this court to enforce a collection of all the relevant tax funds collected by MFS with attorneys' fees, lost earnings and punitive damages.

MFS has asked the court determine under its third and fourth causes of action that it would be against public policy to allow the collection of rates which were unreasonable under the construction of the contracts claimed by defendants, which the court has already denied because of the Johnson Act. As of this date the pleadings represent that these controversies place in dispute over $50,000,000.

### ISSUE BEFORE THE COURT

The court is faced with the following issue: Is jurisdiction precluded in this case by the Johnson Act, 28 U.S.C. § 1342, and by the doctrine of comity?

### DISCUSSION

This case comes within the purview of the Johnson Act[1] for three reasons: First, while requests for declaratory relief and monetary damages are not included on the face of the statute, judicial construction clearly includes such requests within its domain. Second, a ruling by this court on MFS's third and fourth causes of action claiming a violation of public policy manifestly would clearly "affect" an order affecting rates established by the UPSC as fair and reasonable and in the public interest. The other claims of the complaint and counterclaim for declaratory relief and damages also appear to impact sufficiently to require a determination against taking

jurisdiction because of the Johnson Act prohibition. Third, compliance with the other provisions of this Act is without dispute.

The Johnson Act was "the last link in a chain of limitations upon federal judicial power over state regulation which began in *Prentis v. Atlantic Coast Line Co.*"[2] When combined with its twin sister, the Tax Injunction Act, 28 U.S.C. § 1341, it was designed to remove two of the most troublesome sources of dissatisfaction with the federal judiciary: encroachment upon state prerogatives in the area of taxation and utility rate-making.[3]

A. The Johnson Act clearly applies to requests for declaratory relief and monetary damages.

While the language of the Johnson Act does not specifically include declaratory relief, it is clear from opinions of the Court of Appeals for the Tenth Circuit and the United States Supreme Court that the jurisdictional prohibition was intended to apply to declaratory relief and money damages. In *Tennyson v. Gas Service Co.*, 506 F.2d 1135 (10th Cir. 1974), the Court expressly found that Congressional intent forbade placing declaratory relief and money damages outside the scope of the Johnson Act.

It is equally true in the area before us that the considerations which we have briefly considered as influencing a Congressional hands-off policy relating to rate making are not to be defeated by the use of either the declaratory judgment procedure alone or combined with a claim for money damages. A decision going to the merits of the additional relief claimed

---

1. The Johnson Act provides:

    The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:

    (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and

    (2) The order does not interfere with interstate commerce; and

    (3) The order has been made after reasonable notice and hearing; and

    (4) A plain, speedy and efficient remedy may be had in the courts of such State.

2. 1A J. Moore, Federal Practice, ʻ 0.026 at 2281 (footnote omitted).

3. "As noted by Mr. Justice Frankfurter, rate orders and taxation were 'two fields where the greatest dissatisfaction with federal jurisdiction existed.' *Alabama Pub. Serv. Comm'n v. Southern Ry.*, 341 U.S. 341, 358–359, 71 S.Ct. 762, 772–773, 95 L.Ed. 1002 . . . (1951) (concurring in result)," *cited in Tennyson v. Gas Service Company*, 506 F.2d 1135, 1139 n.8 (1974).

would of necessity involve our decision as to the same issues proscribed by the Johnson Act. If favorable to the plaintiffs it would impinge upon duly filed rate schedules and thus affect indirectly that which the Johnson Act precludes.

*Id.* at 1139 (footnotes omitted). In addition, the Tenth Circuit expressly rejected a request for declaratory relief in *Gen Inv. & Serv. Corp. v. Witchita Water Co.*, 236 F.2d 464, 468 (10th Cir. 1956), ruling that the district court should have refused to entertain jurisdiction where the same declaration of rights could have been made in the state court.

■ While neither of these cases was appealed, the Supreme Court has approved in two different ways the Tenth Circuit conclusion that Congress intended declaratory relief to be within the parameters of the Johnson Act. First, in the case of *Bridgeport Hydraulic Company v. Council on Water Company of the State of Conn.*, 453 F.Supp. 942 (D.C.Conn.1978), *aff'd.* 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978), a three-judge district court specifically agreed with the Tenth Circuit rationale expressed in *Tennyson* that declaratory relief was to be included under the Johnson Act.[4] The subsequent affirmance of that case by the Supreme Court indicates an implicit approval of the legal doctrine contained therein.[5] Second, the Tenth Circuit based a portion of its conclusion in *Tennyson* on the Supreme Court's interpretation of parallel language in a similarly restrictive jurisdictional statute.[6] The Tenth Circuit cited the

doctrine announced in *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293–299, 63 S.Ct. 1070–1073, 87 L.Ed. 1407 (1943), wherein the Supreme Court had held that:

The earlier refusal of federal courts of equity to interfere with the collection of state taxes unless the threatened injury to the taxpayer is one for which the state courts afford no adequate remedy, and the confirmation of that practice by Congress, have an important bearing upon the appropriate use of the declaratory judgment procedure by the federal courts as a means of adjudicating the validity of state taxes.

It is true that the Act of Congress speaks only of suits to "enjoin, suspend or restrain the assessment, levy or collection of any tax" imposed by state law, and that the declaratory judgment procedure may be, and in this case was, used only to procure a determination of the rights of the parties, without an injunction or other coercive relief. . . . But we find it unnecessary to inquire whether the words of the statute may be so construed as to prohibit a declaration by federal courts concerning the invalidity of a state tax. For we are of the opinion that those considerations which have led federal courts of equity to refuse to enjoin the collection of state taxes, save in exceptional cases, require a like restraint in the use of the declaratory judgment procedure.

*Tennyson, supra*, 506 F.2d at 1139 (10th Circuit 1974). This Supreme Court doctrine

---

4. The three-judge court was presented with a claim by the plaintiffs that the Johnson Act was applicable only to actions seeking injunctive and not a declaratory judgment. The court responded to such a contention by briefly stating, "We agree with the rationale expressed in the *Tennyson* case, supra, rejecting this identical claim." *Bridgeport*, supra, 453 F.Supp. at 954.

5. An affirmance by the Supreme Court is controlling precedent unless and until it is re-examined by the court. *Hicks v. Miranda*, 422 U.S. 332, 344–345, 95 S.Ct. 2281, 2289–2290, 45 L.Ed.2d 223 (1975). Nonetheless, it is similarly clear that a summary affirmance is not "of the same precedential value as would be an opinion of this court treating the question on the mer-

its." *Edelman v. Jordan*, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974). This court has found no Supreme Court opinion after this affirmance which gives plenary consideration to the Johnson Act, as it relates to declaratory actions.

6. The statute being interpreted by the court was 28 U.S.C. § 1341. It reads as follows: "*The district courts shall not enjoin, suspend or restrain* the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." (Emphasis added.) The emphasized prohibition of positive action is identical to that contained in the Johnson Act.

cited by the Tenth Circuit in 1974 has been reaffirmed continuously by the Supreme Court since its pronouncement, most recently in *Trainor v. Hernandez*, 431 U.S. 434, 444–445, n.8, 97 S.Ct. 1911, 1918–1919, n.8, 52 L.Ed.2d 486 (1977) and *Tully v. Griffin*, 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976). This construction, calling for federal courts to exercise "an equitable duty to refrain from *interfering* with a Stat[e]," *Tully v. Griffin, supra*, 429 U.S. at 73, 97 S.Ct. at 222 (emphasis added), adds credence and Supreme Court recognition to the Tenth Circuit rationale expressed in *Tennyson* which included requests for declaratory relief within the purview of the Johnson Act. The court here is thus constrained to follow this precedent and finds the request for declaratory relief and monetary damages within the scope of the Johnson Act.[7]

B. Would an order by this court "affect" the rates established by the UPSC?

In *Tennyson*, the Tenth Circuit has interpreted the scope to which a federal court may "affect" a previously filed and approved state utility rate order as forbidding any action which would "impinge upon a duly filed rate schedule" by issuing a ruling that would "affect indirectly" an "order [of UPSC] affecting rates."[8] Even placing aside the obvious result that a $42,000,000 judgment in favor of plaintiff MFS would have a direct impact on future orders of the UPSC affecting rates,[9] this court has found by reviewing material previously submitted with other motions and arguments in this case two orders of the UPSC that

would be directly affected by *any* ruling on the issues brought before it in this case. Only two orders of the UPSC are discussed in this opinion. Any of the disputed ten orders between the parties, or those of parties not involved in this case, who have sought similar rulings from the UPSC, could also demonstrate the issue.

On March 5, 1974, in Case No. 7002, the UPSC found that allowing plaintiff MFS to amend its contracts to allow for the inclusion of a favored nation clause was a necessary step in keeping the earlier contract competitive, "accomplish[ing] the public interest requirement that applicant remain competitive in its attempts to acquire new gas supplies." Having approved such a clause, it was interpreted by the UPSC on September 30, 1974, in Case No. 7038, sub. 1. The UPSC spoke of both issues in dispute in the plaintiff's case—the role of vintaging pricing and the role of area pricing.

Although Applicant's purchases from the Uintah Basin Gasoline Plants, namely those plants operated by Shell Oil Company and Gary Operating Company, are not F.P.C. jurisdictional purchases, the purchase price is subject to escalation to the [F.P.C.] Opinion no. 699 price by virtue of a price adjustment clause in each of the contracts which provides for escalation to the highest price allowed by the F.P.C. for the sale of natural gas in the same area as natural gas delivered under said contracts. Each of the contracts has been specifically reviewed and approved by this Commission in its Case Nos. 6596 and 6679.

---

7. *See also Kalinsky v. Long Island Lighting Co.*, 484 F.Supp. 176 (EDNY 1980).

8. *Tennyson*, supra, 506 F.2d at 1139, 1141.

9. The impact would be doubly significant because the UPSC has for several years approved rates which were premised on the assumption that plaintiff MFS would be paying the higher rates charged by defendants. To now hold that the contract did not call for such prices would allow MFS to recover *both* the $42,000,000 presently sought and enjoy the past benefits from the increased rates obtained on the representation that it owed such money. While such a windfall would clearly impact on a utility subject to the regulation of the UPSC, it is

not one which would have a direct, obvious impact enjoining or suspending an earlier ruling establishing rates. It would, however, undercut the factual basis for the UPSC rationale that the adoption of the favored nation clauses was in the public interest, because it allowed MFS to remain competitive. As such, while not considered in detail in this opinion, the application of the Johnson Act would be justified to avoid judicial action that would have a clear impact on future rates by undercutting the *legal theory, the factual determination* or *pronouncement of public policy* as established in an earlier order/opinion, without addressing itself to the actual rate order itself.

After noting that plaintiff MFS had been paying an increased price since the issuance of the FPC Opinion No. 699, on June 21, 1974, the Commission found that

5. It is in the public interest for Applicant to acquire as much natural gas for its service areas as possible.

6. Applicant cannot remain competitive in its purchases of gas from ... Shell Oil Company, Gary Operating Company and other pipelines and producers without paying said companies the increased charges they have imposed on applicant.

7. If Applicant cannot remain competitive it will be unable to acquire sufficient amounts of natural gas to serve its customers.

8. *Because it is in the public interest that Applicant acquire all of the natural gas possible for its service area, Applicant must be permitted to pay competitive prices for natural gas supplies for its service area.*

9. The Applicant's proposed rate increases to its customers are based solely upon price increases charged to Applicant by its suppliers ... such rate increases being "straight pass-on" increases. (Emphasis supplied.)

While vintaging is not specifically mentioned, it is clear that the Commission had approved the defendants' billing of MFS which was premised on the right to charge the highest price for gas and upon the pragmatics of the marketplace to get the necessary supply the buyer had to pay the real market price. In addition, the use of the term "area" in the contract and the discussion of "area" in reference to the use of that term in F.P.C. Opinion no. 699 is important. Such implies a definition of the term "area" as used by the UPSC. If one assumes that the UPSC would apply the original definition of "area" used in the contract (which contract was written before the relevant F.P.C. opinion was applied to the contract by the UPSC), then the result of a decision of this court interpreting the term makes clear the impingement on rate making. It is obvious that were this court to rule in accord with MFS's interpretations

of proper pricing, it would directly undercut, if not overrule, the findings and conclusions of the UPSC in Case no. 7038 sub. 1. Such an interference would violate the Johnson Act and require a remand of all MFS's causes of action based on the contract provision at hand for lack of jurisdiction. Even were such clear potential for direct interference not evident, any decision by this court construing and applying a favored nation clause under these circumstances would be preemptive of the exercised powers and prerogatives of the UPSC. This would require all of the significant claims raised by the parties to be remanded under the Johnson Act.

After explicitly approving the amended contracts in dispute with favored nations clauses, the UPSC indicated in Case no. 78–059–03, in which MFS appeared as an interested party, that the "favored nations clauses" may no longer be acceptable to the UPSC. In their conclusions of law, two of the three persons on the Commission opined that

A second problem causing the Commission concern with the gas purchase is the inclusion of favored nations provisions. This Commission has previously approved inclusion of such provisions in gas purchase contracts. However, we feel this particular issue ought to be re-examined .... Our continued approval of such clauses ignores the vintaging provisions contained in [F.P.C.] Opinion 770 and 770–A which fix the prices of older interstate gas services at lower levels.

The use of a favored nation clause in the contract before us tieing prices from one production area to another is totally without justification. The explanation that the seller wants the same price for its gas in all production areas is insufficient, since such pricing would not necessarily bear any relationship to production costs. (Aug. 31, 1978.)

In this order the UPSC appears to conclude that the favored nations clauses are no longer in the public interest and that vintaging pricing should be applied. However, the practical result of the expansive lan-

guage is by no means clear. First, the call for reexamination, while clearly stated, does not indicate any application to earlier rulings approving such, nor does it define its future application, outside this one particular case. Second, the scope of this particular pronouncement is challenged by one of the three Commissioners:

> However, I have serious reservations about the general applicability of this decision to other gas purchase contracts that may come before this Commission. The majority's treatment of "favored nations clauses" should be limited to the individual facts of this case; to generalize these results to a broad disapproval of favored nation clauses could have serious ramifications on the Utah intrastate natural gas market. There was not sufficient evidence presented to the Commission in this case to warrant any extension beyond the Utah Gas-Cordillera contract. (Olaf E. Zundel, Commissioner, Case no. 78–059–03, concurring in part, dissenting in part at 2.)

The complaint of the dissent as to the broad applicability of the language and the possible result in other cases takes on added significance when it is recognized that the same UPSC on October 12, 1978, approved a "pass-through" application filed by MFS for rate increases authorized by the favored nations clauses in their contracts with Shell and Gary in Case no. 78–057–11. This was some six weeks after the August 31, 1978, opinion with the language indicating that the prior policy relative to favored nation clauses should be reconsidered. Third, the parties before the UPSC were a parent corporation and a wholly-owned subsidiary. The application of the favored nations clause could be strikingly different when viewed between the three arms-length parties in this court. Fourth, the UPSC has the power to reconsider its earlier opinions or decisions. Section 54–7–13, U.C.A. (1953) *Bowen Trucking Inc. v. PSC*, 559 P.2d 954, 956-957 (1977).

■ At the present, it is not clear that UPSC desires to continue applying the favored nations clauses to Utah public utility supply contracts in an effort to uphold the public interest as stated in the orders in this case. Were this court to broadly construe the ramifications of that clause, it would be preempting the UPSC's power to decide if such an expansion of the doctrine is in the public interest.[10] Were it to narrowly construe it, it would similarly be deciding what was in the best public interest. This would create confusion by setting federal precedent on the UPSC's right and obligation to approve said contract in the first instance,[11] or to withdraw such approval upon a request for review by a proper party as a vital part of its rate determination power.[12]

---

10. This court is prohibited under the Johnson Act from deciding issues which are intertwined with the public-policy making delegated to state governments and appropriate state agencies. As noted, any decision interpreting the favored nations clause would "impinge" on the construction given the clause by the UPSC. Such action is prohibited. Therefore, this court is not one of "competent jurisdiction" to enforce an order of the UPSC under § 54–7–22 U.C.A. (1953). Counsels' arguments to the contrary cannot confer jurisdiction upon this court. State law also cannot confer jurisdiction upon a federal court. *Burford v. Sun Oil Co.*, 319 U.S. 315, 317, 63 S.Ct. 1098, 1099, 87 L.Ed. 1424 (1943).

11. Section 54–4–26 U.C.A. (1953). Every public utility when ordered by the commission shall, before entering into any contract for construction work or for the purchase of new facilities or with respect to any other expenditures, submit such proposed contract, purchase or other expenditure to the commission for its approval; and, if the commission finds that any such proposed contract, purchase or other expenditure . . . is not proposed in good faith for the economic benefit of such public utility, the commission shall withhold its approval of such contract, purchase or other expenditure, and may order other contracts, purchases or expenditures in lieu thereof for the legitimate purposes and economic welfare of such public utility.

12. Section 54–3–9 U.C.A. (1953). . . . Nothing in this section shall prevent the commission from revoking its approval at any time and fixing other rates and charges for the product or commodity or service, as authorized by this title.

Section 54–4–2 U.C.A. (1953). Whenever the commission believes that in order to secure a compliance with the provisions of this title or with the orders of the commission, or that it

MFS has emphasized that it does not ask the court to "enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility," as prohibited by the Johnson Act. It asks only that the court interpret clauses of the contract in dispute, as between the private parties. Counsel represents the UPSC is waiting to hear what this court has to say before it acts. The inference is that the UPSC will then handle it from there and, it may be presumed, make any necessary adjustments in the rates which this court's judgment may justify. The parties may thus assist in the rate-making process as required to do so. If successful, MFS has represented that the recovery will be applied to a refund.

What MFS proposes from the perspective of the Johnson Act accentuates how clearly the Act does apply. The UPSC has already examined the contracts and made its findings that they do in effect provide a price that is fair and reasonable in the market place, and justified the rate set by the UPSC. Should the court adopt MFS's present construction of the contract and grant recovery it would in effect indirectly determine that the real facts, as found by this court, did not support the rate set by the Commission and that the rate was therefore not fair and reasonable. It would require the UPSC under its continuing obligation to review the rates and the factors bearing upon reasonableness to rehear the matter. This would manifestly "impinge" and impact upon an order affecting rates chargeable by a public utility and be a significant intrusion by the federal court into the state's rate-making process.

---

will be otherwise in the interest of the public, an investigation should be made of any act or omission to act, or of anything accomplished or proposed, or of any schedule, classification, rate, price, charge, fare, toll, rental, rule, regulation, service or facility of any public utility, it shall investigate the same upon its own motion, and may fix a time and place for a hearing thereof with notice to the public utility concerning which such investigation shall be made, and upon such hearing shall make such findings and orders as shall be just and reasonable with respect to any such matter.

### C. The remaining requirements of the Johnson Act are satisfied.

As the Johnson Act requires, jurisdiction here is based upon diversity of citizenship. The order setting the rates in question does not interfere with interstate commerce, was made after reasonable notice and hearing, and there is a plain, speedy and adequate remedy in the state courts. Hence, the prohibition of the Johnson Act applies.

The parties have failed to satisfactorily explain why there is not an adequate remedy in state court. There is in fact an adequate remedy there. The claim of jurisdiction in the federal court is based upon diversity of citizenship. The court would, like a state court, be applying state law, which the state court could presumptively do better. With a remand of the matter to the state court, then such contract interpretation and/or reference to the UPSC can be carried out as the law may allow and require, to assist the parties in obtaining the relief sought. A state court decision or an order of the UPSC could be appealed to the Supreme Court of the State of Utah, the final arbiter on the Utah law that would apply to the interpretation of the contracts. In addition, the Supreme Court is the only court that can review the orders of the UPSC. A trial and an interpretation of the contracts in the federal court, with an appeal to the Court of Appeals of the Tenth Circuit, would not be as helpful or as authoritative, particularly with the involvement here of the UPSC, its rate orders and the applicable statutes referred to.

Gary and Shell have also asked the court not to remand the case to the state court. Their reasons, they say, are different.

---

Section 54–7–13 U.C.A. (1953). The commission may at any time, upon notice to the public utility affected and after opportunity to be heard as provided in the case of complaints, rescind, alter or amend any order or decision made by it. Any order rescinding, altering or amending a prior order or decision shall when served upon the public utility affected have the same effect as is herein provided for original orders or decisions.

They have said the UPSC has determined that certain taxes are due and collectable and require an upward adjustment of the price of gas purchased. MFS has been collecting the taxes, but has not paid them over. The entitlement to these taxes is based upon the UPSC's construction of the favored nations clauses and federal opinion orders that allow an upward adjustment of the claimed prices by the amount of the taxes. Since the tax increments adjust the price upwards by application of the favored nations or escalation clauses, the problems are the same as examined in responding to the position of MFS on the "most favored nation clause." The parties are simply on opposite sides of the issue. Whatever the result reached, it would be a situation where, as explained above, the Johnson Act precludes the court sitting.[13]

There is one further issue which it appears may be affected by the Johnson Act. This is the claim of Gary for entitlement to *additional taxes* assessed or increased since the date of the contract (July 5, 1972), under the provisions of V–5 of the contract. This simply articulates how applicable state tax increases should be allocated and borne by the parties to the contract, and has nothing to do with the favored nation clause. Here it could be argued that the court technically might hear both sides of this issue, interpret the contract provisions, determine if a valid order of the UPSC required the increase be paid, and then "enforce" the order of the UPSC with respect thereto as Gary claims, or refuse to do so on the grounds asserted by MFS. However, the issue would be rife with rate making and enforcing entanglements with the state agency.[14] It appears likely the Johnson Act would bar the court from hearing it. Certainly it could be heard by the state court more effectively and with less stress on relations between the state and the federal government. At the least it would not justify keeping the whole cause before this court, rather than sending it to the state court. Hence, it should be remanded with the others to the state court under principles of comity.

In addition, § 54–7–13, U.C.A. *et seq.* (1953 as amended) permits the UPSC to change or modify its decisions and failure of MFS or Shell and Gary to seek appellate review or a re-hearing of the matter by the UPSC does not remove the effectiveness of the appeal available under Utah law. *North Salt Lake v. St. Joseph Water & Irr. Co.*, 118 Utah 600, 223 P.2d 577, 583 (1950); *Klotz v. Consolidated Edison Company of New York*, 386 F.Supp. 577, 587 (1974). Indeed, the Fifth Circuit has held in *Henry v. Metropolitan Dade County*, 329 F.2d 780 (5th Cir. 1964).

> The obligation of this federal court is clear from a reading of the Johnson Act. The existence of a remedy in state court effectively ousts the federal court of jurisdiction, and the initial suit filed by appellant was properly dismissed. The expiration of time in which the state suit might have been brought does not result in the destruction of the plain and simple remedy specified in the Johnson Act. To hold otherwise would allow any disgruntled taxpayer to simply wait until the statute of limitations had run in the state courts and then bring suit in the federal court.

*Id.* at 781.

For the reasons expressed herein, the court finds that it is compelled by the provi-

---

**13.** Even if the Johnson Act were not applicable, the prohibitions in its twin statute, the Tax Injunction Act, 28 U.S.C. § 1341, construed in the manner discussed in this opinion, would prohibit this court from assuming jurisdiction over the counterclaims. This conclusion need not be dispositive, however, as the doctrine of comity, in any event, would require the counterclaims raised by the defendants to be remanded to state court.

**14.** Proper determination would require this court to sit in judgment and analyze the intent of not only the parties but also members of the UPSC when the contracts were approved. Furthermore, were Gary to prevail, and MFS still refused to pay over, this court would have to have available its contempt powers to enforce a federal judgment relative to utility rates which are exclusively governed by state law and administered by state agencies. These considerations make the need for remand to state court under the Johnson Act obvious.

sions of the Johnson Act to conclude that it does not have jurisdiction to hear the mentioned matters raised by the parties through their pleadings, memoranda or oral argument in the instant case. As to those issues of which it might take jurisdiction, principles of comity require that the court decline to sit. In view of the foregoing,

IT IS HEREBY ORDERED that this case be remanded to the District Court of the Third Judicial District, in and for Salt Lake County, State of Utah. The clerk is accordingly directed to prepare and return the files in this case to said court.