**NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Plaintiff,**

**Public Service Commission of the State of New York, Plaintiff–Intervenor,**

**v.**

**TGX CORPORATION and Paragon Resources, Inc., Defendants.**

**No. CIV–84–1372E.**

United States District Court, W.D. New York.

Nov. 7, 1990.

---

Heino H. Prahl, Buffalo, N.Y., for plaintiff.

Jonathan Feinberg, Albany, N.Y., for plaintiff-intervenor.

Alan Lipman, Buffalo, N.Y., for defendants.

## MEMORANDUM AND ORDER

ELFVIN, District Judge.

This Court presently revisits the question whether a state regulatory agency which "disapproves" a contract between a public utility and a private person pursuant to its statutory authority but without affording notice of its accompanying proceedings to the person violates such person's Fourteenth Amendment due process rights.

Briefly and by way of background, the plaintiff, National Fuel Gas Distribution Corporation ("NFG"), is a New York corporate gas distributor with its principal place of business in this state. Defendants TGX and Paragon Resources, Inc. ("Paragon") are gas producers incorporated under Delaware law with their principal places of business outside New York.[1] *See* 28 U.S.C. § 1332. They are parties to a gas-purchasing agreement ("the Agreement") which contains an "escalation clause" whereby the price for gas purchased thereunder by NFG is to increase annually by an amount equivalent to the yearly escalated increase in NFG's weighted average cost of gas purchased from three specific interstate pipelines.[2]

New York's Public Service Commission ("the PSC"), a state regulatory agency empowered to "disapprove" of gas purchase contracts involving unjust and unreasonable charges—*see* sections 4 and 110(4) of New York's Public Service Law ("NYPSL") —, issued an order in 1983 ("the Opinion") finding that, because of the escalator provisions, NFG's procurement contracts (including the Agreement) "require, expressly and implicitly, that NFG pay excessive prices for gas" and that therefore such contracts "are not consistent with the public interest." PSC Opinion No. 83–26, Case 28447, National Fuel Gas Distribution Corp.—Gas Rates (December 20, 1983) at p. 14.[3] Confronted with a question as to "what steps to take to 'transform' the three-pipeline escalator [clause] into an acceptable one[,]" the PSC observed that "[a] proposal that we effectively rewrite the contracts to include a ceiling on gas cost recoveries may not comport with [NYPSL] § 110(4)"—*ibid.*—and concluded:

"We have found the current local production contracts to be unacceptable, and we conclude that the better course is simply to disapprove the contracts. NFG appears to believe that such disapproval would enable it to rescind the contracts, in which case it might negotiate more acceptable agreements. Regardless of what the company does, however, our disapproval of the contracts constitutes notice that we shall not allow it, in the future, to recover from its customers any charges for locally-produced gas that exceed just and reasonable charges for such gas." *Id.* at p. 15.

NFG challenged the Opinion by commencing a state proceeding under Article 78 of New York's Civil Practice Law and Rules. The New York State courts upheld the PSC's Opinion as having a rational basis and as being supported by substantial evi-

---

**1.** TGX's principal place of business is in Texas, while Paragon's is in Louisiana. There is no dispute that the amount in controversy exceeds the minimum required. *See* Answer and Counterclaim to Amended and Supplemental Complaint, ¶ 3.

**2.** The Agreement as entered into in 1974 was between Iroquois Gas Corporation and Paragon.

The former's interest therein was subsequently assigned to NFG and the latter's to TGX.

**3.** A copy of pertinent portions of PSC Opinion No. 83–26 is included as Exhibit B to the supplemental affidavit of Heino H. Prahl, Esq. (sworn to November 22, 1985) (Clerk's Docket Item No. 10).

dence in the record. *See National Fuel Gas Distrib. Corp. v. Public Service Comm'n,* 107 A.D.2d 357, 487 N.Y.S.2d 150, 151 (3rd Dept.), *aff'd without opinion,* 66 N.Y.2d 956, 498 N.Y.S.2d 798, 489 N.E.2d 767 (1985).

This suit was instituted to determine the rights and liabilities of the parties under the Agreement in light of the Opinion. NFG has alleged that the Agreement was thereby effectively voided or "cancelled" and that NFG was under no continuing liability to the defendants. *See* Amended and Supplemental Complaint, ¶ 29. The defendants have counterclaimed, *inter alia,* for a declaration that the PSC had lacked jurisdiction to issue an order respecting them, that their Fourteenth Amendment due process rights were violated in that they were never given notice of the PSC's proceedings with respect to the Agreement, that the Opinion did not by its terms purport to void or cancel the Agreement and that the Agreement remained and remains in full force and effect. *See* Answer and Counterclaim to Amended and Supplemental Complaint. The PSC was permitted to intervene (pursuant to Fed.R.Civ.P. rule 24) in 1986 because, in this Court's stated view at the time,

"[a] decision that the gas purchase agreement is valid, that the PSC had no power to affect the gas purchase agreement or that the PSC's procedure had violated the defendants' rights would impede the PSC's interest in enforcing Opinion No. 83–26 and would likely affect the PSC's future ability to regulate." Memorandum and Order, dated November 7, 1986, at p. 3, 1986 WL 12486.

Upon NFG's motion for summary judgment and the defendants' cross-motion for partial summary judgment, it was declared by this Court that the Opinion voided the escalation provisions but that the remainder of the Agreement continued in force. Memorandum and Order, dated October 1, 1987, at p. 15, 1987 WL 17863. At the same time, the defendants' constitutional counterclaim was rejected. *Id.* at 14–15. The very brief discussion of the basis for the dismissal was, in its entirety, as follows:

"The defendants assert that the PSC improperly exercised its power under [NYPSL section] 110.4 by having failed to provide them with notice of the hearing concerning the [Agreement] and with an opportunity to be heard and, thus, that their procedural due process rights had been violated. However, the PSC's decision concerning the three-pipeline escalator [provisions] arose during a rate making proceeding. Whether the three-pipeline escalator [clause] was in the public interest as well as the rate making procedure itself concerned rulemaking by the PSC and were not adjudicatory. *See* section 102 of New York's Administrative Procedure Act. In the context of rulemaking, the defendant had not been entitled to formal notice. *See Bi-Metallic Co. v. Colorado,* 239 U.S. 441, 445 [36 S.Ct. 141, 142, 60 L.Ed. 372] (1915). No due process violation is found." *Ibid.*

No challenge was made by the defendants to the dismissal of their counterclaim, but NFG moved for clarification and/or reconsideration of the October 1, 1987 declaration and, upon reconsideration, this Court arrived at a "non-binding conclusion" that the disapproved escalation provision had been an essential element of the Agreement and that therefore such Agreement is unenforceable absent its pricing provision. It was "tentatively declared" that the Agreement is void. Tentative Memorandum, dated March 18, 1988, at p. 5, 1988 WL 27583. This Court's tentative views were subsequently solidified into a declaration that the Agreement had been voided by the Opinion and that the Agreement "is no longer of any force or effect." Memorandum and Order, dated December 10, 1988, at p. 8, 1988 WL 132557.

In a pair of subsequent rulings, it was determined that the Johnson Act, 28 U.S.C. § 1342, which forbids federal challenges to state regulatory orders affecting rates chargeable by a public utility, does not divest this Court of jurisdiction over either NFG's declaratory action or the defendants' constitutional counterclaim. Memorandum and Order, dated May 10, 1990,

469

1990 WL 66231, *reconsideration denied,* Memorandum and Order, dated July 2, 1990, 1990 WL 98433. In a footnote in the earlier of such rulings this Court invited re-argument of the due process claim, which claim had been summarily dispensed with in October 1987. It was said,

"The defendants' due process claim has been rejected by this Court, it having been found that in the context of non-adjudicatory administrative proceedings formal notice is not required by the Constitution. Memorandum and Order, dated October 1, 1987, at pp. 14–15 (*citing Bi–Metallic Co. v. Colorado,* 239 U.S. 441 [36 S.Ct. 141, 60 L.Ed. 372] (1915)). On re-examination such conclusion may have been based on a dubious assessment of antiquated case law. *Bi–Metallic Co. v. Colorado,* a '*Lochner* era' decision, was a suit to enjoin the Colorado state tax commission from enforcing its order increasing the valuation of all taxable property in the city of Denver on grounds that the city's real property owners had not received an opportunity to be heard prior to the order's issuance. The challenge was rejected by the United States Supreme Court because '[w]here a rule of conduct applies to more than a few people it is impracticable that every one should have a direct voice in its adoption.' *Bi–Metallic Co. v. Colorado, supra,* at 445 [36 S.Ct. at 142]. The order was deemed legislative rather than adjudicatory, and thus, 'to put the question [was] to answer it. There must be a limit to individual argument in such matters if government is to go on.' *Ibid.* Here, by contrast, the PSC's order was limited to an evaluation of a small set of agreements between discrete and readily-identified parties. While offering no view respecting whether *Bi–Metallic Co. v. Colorado* has survived the marked evolution of due process jurisprudence in this century, this Court considers its facts plainly inapposite. The due process claim may be reargued * * * if the defendants are so inclined." Memorandum and Order of May 10th, *supra,* at p. 13 fn. 10.

The defendants have since taken up the invitation and moved for reconsideration of the October 1987 ruling insofar as it had dismissed their due process counterclaim. The defendants argue in support of their motion that they had not received notice of the PSC hearings which had preceded the issuance of the Opinion, that the Opinion "destroyed" their economic interests under the parties' disapproved gas purchase agreement and, therefore, that they were deprived of property without due process of law. *See* Defendants' Memorandum of Law, filed June 21, 1990. NFG counters that the defendants had no cognizable property interest in the disapproved agreement and, even if they had, that the defendants nevertheless had an opportunity to be heard, *post*-disapproval, which opportunity fully satisfied the requisites of due process under the circumstances. *See* NFG's Memorandum in Response to Defendants' Due Process Claim, filed July 16, 1990. The PSC, for its part as an intervening plaintiff, responds to the defendants' motion by contending that this Court's prior ruling on the due process claim was correctly reasoned and, as determined in such ruling, that *Bi–Metallic Co. v. Colorado, supra,* "is the controlling precedent." *See* PSC Letter Brief, dated July 12, 1990, at p. 2.

■ Undisputedly, the defendants did not receive prior notice of the PSC proceedings supportive of the Opinion, and the PSC did not furnish the defendants with a copy of the Opinion following its issuance. *See* Defendants' Motion for Partial Summary Judgment, filed February 9, 1987, Exhibit H thereto (Affidavit of John J. Kelliher, Secretary to the PSC, sworn to June 27, 1986, ¶ 3) (admitting the absence of notice). The question this Court reconfronts is whether such "courtesies" could constitutionally be dispensed with under the circumstances.

■ Procedural due process of law should be understood with relation to its "two indispensable components." *See Oberlander v. Perales,* 740 F.2d 116, 120 (2d Cir.1984). One requirement of due process is an opportunity to be heard within a

meaningful time and in a meaningful manner at a proceeding affecting one's life, liberty or property. *E.g., Goldberg v. Kelly,* 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). But "[t]his right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Thus, the "elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." *Ibid.*

■ *Bi–Metallic Co. v. Colorado, supra,* however, stands for the proposition that the twin requisites of due process are inapplicable to public bodies' policy decisions impacting upon the interests of more than "a few people." *Id.* 239 U.S. at 445, 36 S.Ct. at 142. The PSC asserts in its Letter Brief, *supra,* at p. 2, that its Opinion concerned not merely the gas purchase agreement between NFG and the defendants but additionally "some 117 contracts between [NFG] and 89 local gas producers." And, it says, these eighty-nine "are obviously more than 'a few people.'" *Id.* at p. 3. Thus, the PSC concludes, it need not have notified the gas producers before determining that their contracts with NFG provided for excessive charges for gas. *Ibid.*

The PSC's guiding premise is grossly in error. While NFG's millions of customers indisputably were not entitled to personal notice regarding the Opinion notwithstanding its effect on their utility rates, the eighty-nine local gas producers were, as a matter of law, "a few people" whose contractual interests were adjudicated by the PSC when it "disapproved" their agreements with NFG.

It bears stressing that, in comparison with the "discrete and readily-identified" eighty-nine gas producers involved in the instant scenario, *Bi–Metallic Co. v. Colorado, supra,* concerned "a suit to enjoin the Colorado state tax commission from enforcing its order increasing the valuation of all taxable property in the city of Denver." Memorandum and Order of May 10th, *supra,* at p. 13 fn. 10. Concededly, in 1915 (when *Bi–Metallic Co. v. Colorado* was decided), Denver was not so large a city as it is today.[4] Yet Denver was even then a metropolis and requiring an individualized notice to each of its real property owners of the state tax commission's ruling would have been, as the Court said, highly impracticable. Conversely, a class of eighty-nine persons is not so inordinately large that the requisites of due process must be dispensed with on purely numerical grounds. *See Mullane v. Central Hanover Tr. Co., supra* (held that the best method of notice available was required prior to the judicial settlement of accounts of a common trust fund of 113 separate trusts with many total beneficiaries, the exact number of which was not in the record). More troublesome is the implicit distinction drawn in *Bi–Metallic Co. v. Colorado* between adjudicatory proceedings and legislative or quasi-legislative proceedings:

"The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached as it might have been by the State's doubling the rate of taxation, no one would suggest that the Fourteenth Amendment was violated unless every person affected had been allowed an opportunity to raise his voice against it before the body entrusted by the state constitution with the power." *Id.* at 445.

**4.** *Compare* U.S. Census Reports, 1910 (population of Denver tabulated at 213,859) *with* U.S. Census Reports, 1980 (Denver population of 492,365).

The principle has been expressly re-affirmed by the United States Supreme Court, which recently stated that "[t]he Constitution does not grant to members of the public generally a right to be heard by public bodies making decisions of policy" and that "[t]he pragmatic considerations identified by Justice Holmes in *Bi–Metallic [Co. v. Colorado], supra,* are as weighty today as they were in 1915." *Minnesota Bd. for Community Colleges v. Knight,* 465 U.S. 271, 283, 285, 104 S.Ct. 1058, 1065, 1066, 79 L.Ed.2d 299 (1984). Unquestionably, the PSC's proceedings in this case involved a substantial measure of policymaking with respect to the guidelines for setting public utility rates. *See Owners Committee on Elec. Rates v. PSC,* 150 A.D.2d 45, 545 N.Y.S.2d 416 (3rd Dept.1989), *rev'd,* 76 N.Y.2d 779, 559 N.Y.S.2d 957, 559 N.E.2d 651 (1990) (adopting the dissenting opinion of Levine J., in the decision below) (*see* 545 N.Y.S.2d, at 420). Hence it was said in this Court's earlier ruling, in rejecting the defendants' violation-of-due process contention, that, "[i]n the context of rule-making, the defendant[s] had not been entitled to formal notice." Memorandum and Order, dated October 1, 1987, *supra,* at p. 15. Yet it was overly facile for this Court to have suggested thereby that the PSC's Opinion was purely a policy declaration. Otherwise valid contracts were effectively disapproved by the Commission and thereby, aside from the millions of NFG's customers, "a relatively small number of persons [the eighty-nine gas producers] was concerned, who were exceptionally affected, in each case upon individual grounds * * * *"; such circumstances are sufficient to distinguish this case as one in which individualized notice and an opportunity to be heard was required for such persons. *See Bi–Metallic Co. v. Colorado, supra,* 239 U.S. at 445–446, 36 S.Ct. at 142–143 (distinguishing *Londoner v. Denver,* 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908)).[5]

■ NFG argues, however, that the defendants' property interest in the Agreement was "delineated" and limited by the PSC's statutory authority, under NYPSL § 110(4), to disapprove unreasonable price provisions. The defendants, NFG says, therefore had no property interest in any unreasonable charges it had contracted to receive for supplying gas to NFG and, thus, no due process rights respecting these charges. *See* NFG's Memorandum, *supra,* at pp. 15–20. But the fallacy in such line of argument is self-evident; NFG has the proverbial cart before the horse. It was not apparent that the price provisions of the Agreement were unreasonable until after the PSC had made its determination. It is incomprehensible how the determination of unreasonableness *vel non* following administrative hearings can govern the question whether notice should have preceded such hearings and whether an opportunity to be heard at the hearings should have been made available. The defendants presumptively had a sufficient property interest in the Agreement under New York's law of contracts, thereby implicating due process rights.

However in this Court's considered view, the defendants received the process due them *after* the issuance of the PSC Opinion. *See* NFG's Memorandum, *supra,* at pp. 20–31. Courts have "rejected the proposition that 'at a meaningful time and in a meaningful manner' *always* requires the State to provide a hearing prior to the initial deprivation of property." *Parratt v. Taylor,* 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981); *e.g., Oberlander v. Perales, supra,* at 120 ("declin[ing] to attach talismanic significance to the availability of a pre-deprivation evidentiary hearing" respecting a health care provider's reduced Medicaid reimbursement rate). "[T]he timing and the nature of the required hearing 'will depend on appropriate accommodation of the competing interests involved.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 434, 102 S.Ct. 1148, 1157,

---

5. In *Londoner v. Denver,* according to Justice Holmes's distinguishing language, "a local board had to determine 'whether, in what amount, and upon whom' a tax for paving a street should be levied for special benefits." *Bi-Metallic Co. v. Colorado, supra,* 239 U.S. at 446, 36 S.Ct. at 142.

71 L.Ed.2d 265 (1982) (*quoting from Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975)). These interests are (1) the private interest affected, (2) the risk of erroneous deprivation under existing procedures and probable value of additional safeguards and (3) the interest of the government. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Here, it is evident that, while the defendants had not formally been served with a copy of the Opinion from the PSC, nevertheless they had had actual notice of its contents within two weeks, having been advised of the relevant portions by agents of NFG. *See* NFG's Memorandum, *supra,* at pp. 5–6. And, being thus apprised of the PSC's disapproval of the Agreement, the defendants had an opportunity to be heard thereon through the PSC's "mandatory rehearing procedure" under NYPSL § 22 [6] or, failing that, through a judicial challenge to the Opinion under Article 78 of New York's Civil Practice Law and Rules. *See Jamaica Water Supply v. P.S.C.,* 152 A.D.2d 17, 547 N.Y.S.2d 933, 935 (3rd Dept. 1989) (re NYPSL § 22); *Dairylea Cooperative, Inc. v. Walkley,* 38 N.Y.2d 6, 9–11, 377 N.Y.S.2d 451, 453–455, 339 N.E.2d 865, 866–868 (1975) (re Article 78); *New York Tel. v. State, Div. of State Police,* 85 A.D.2d 803, 445 N.Y.S.2d 609 (3rd Dept. 1981), *aff'd,* 58 N.Y.2d 658, 458 N.Y.S.2d 519, 444 N.E.2d 983 (1982) (re both procedures). Although the defendants would obviously have preferred to have had an opportunity to be heard prior to the issuance of the Opinion, the existing post-issuance procedures were quite satisfactory to prevent the risk of erroneous deprivation of property in view of the relative private and government interests. The defendants, as above discussed, had a substantial property interest in the terms of the Agreement, the significance of which interest should not be understated or belittled.[7] Yet the State regulatory interest in protecting consumers from unjust and unreasonable gas utility charges superseded the defendants' private interests and justified the absence in this case of pre-deprivation procedures. The effective operation of PSC proceedings would be, perhaps critically, impaired if gas producers were permitted to be involved from the outset whenever their contractual interests might be considered in jeopardy. Preferably, from the standpoint of the public good, gas producers should be relegated to protecting their interests via the ample post-deprivation procedures in those few instances in which they believe their prop-

6. Such statute provides:

"After an order has been made by the commission [*i.e.,* the PSC] any corporation or person interested therein shall have the right to apply for a rehearing in respect to any matter determined therein, but any such application must be made within thirty days after the service of such order, unless the commission for good cause shown shall otherwise direct; and the commission shall grant and hold such a rehearing if in its judgment sufficient reason therefore [sic] be made to appear. The decision of the commission granting or refusing the application for a rehearing shall be made within thirty days after the making of such application. If a rehearing shall be granted, the same shall be determined by the commission within thirty days after the same shall be finally submitted. An application for such a rehearing shall not excuse any corporation or person from complying with or obeying any order or any requirement of any order of the commission, or operate in any manner to stay or postpone the enforcement thereof except as the commission may by order direct. If, after such rehearing and a consideration of the facts, including those arising since the making of the order, the commission shall be of opinion that the original order or any part thereof is in any respect unjust or unwarranted, or should be changed, the commission may abrogate or change the same. An order made after any such rehearing abrogating or changing the original order shall have the same force and effect as an original order but shall not affect any right or the enforcement of any right arising from or by virtue of the original order."

7. Article I, section 10, clause 1 of the Constitution specifically recognizes the proprietary value of contractual rights, prohibiting the States from passing laws impairing their obligations. While the PSC's disapproval authority under NYPSL § 110(4) does not abridge such provision here inasmuch as the state legislation preceded the parties' Agreement—*see Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 413–416, 103 S.Ct. 697, 705–707, 74 L.Ed.2d 569 (1983)—the contracts clause is of pertinence in attributing weightiness to private, contractual property interests under the due process clause.

erty interests have been deprived for substantively improper reasons.[8]

Accordingly and on reconsideration and this Court having determined that, although the defendants were entitled to due process respecting PSC Opinion 83–26, they nevertheless received the process due them, it is hereby ORDERED that the defendants' motion to reinstate their due process counterclaim is denied.

---

8. Notwithstanding that the PSC need not give notice *before* disapproving a gas purchase agreement, *after* it does so it ought to alert *all* parties to such agreement by serving a copy of its opinion wherein the disapproval is rendered. The PSC was remiss in not doing so in this case. However, the result is not altered inasmuch as, this Court determines, the defendants nonetheless had sufficient actual notice of the PSC's disapproval of the Agreement.