In the Matter of REPUBLIC LIGHT, HEAT AND POWER COMPANY, INC., Petitioner, against PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Respondent.

Third Department, November 11, 1942.

*John Howell, Killeen and Sweeney* (*Henry W. Killeen* of counsel), for petitioner.

*Gay H. Brown* (*Raymond J. McVeigh* of counsel), for respondent.

CRAPSER, J.  This proceeding brings up for review the determination of the Public Service Commission disapproving a contract dated July 23, 1938, between Republic Light, Heat and Power Company, Inc., and Penn-York Natural Gas Corporation, hereinafter called Republic and Penn-York.

The Republic was incorporated in 1921, it is a public utility engaged in the production, purchase and distribution of gas, natural and manufactured; it operates in the western New York counties of Chautauqua, Erie, Niagara and Genesee and in its distribution field are included fifty municipalities and hamlets.  It has more than 22,000 customers.  It has 238 producing wells on lands owned or leased by it.  The gas sand underlying

its wells and leases is mostly Medina sand and the fields are commonly referred to as Medina fields.

In addition to the gas from its own wells Republic purchased from local independent drillers gas and has so continued to do until the present time. In 1926 it was discovered that the Republic was being pinched for gas and that the Medina gas field was going down. A survey of its drilling operations showed that, taking the results over a period of years, more than seventy per cent of all wells drilled had turned out to be dry. It then made an arrangement and contract with the Iroquois Natural Gas Corporation for the purchase of sufficient gas to assure itself against the danger of sudden and acute shortage. The arrangement with Iroquois ran for ten years. In the first five-year period the prices went to the top of sixty cents and went as low as fifty-two and a half cents per thousand cubic feet. For the second five-year period all gas was taken and paid for at fifty-two and a half cents per thousand cubic feet. The Iroquois was also a distributor and the Republic interested itself in the proposition of buying its gas from the Penn-York and having the gas transported from the points of production to the distribution lines of Republic.

The Penn-York was created from two predecessor corporations. The Penn-York Natural Gas Company (New York State) was incorporated in 1931, the Penn-York Natural Gas Corporation (Pennsylvania) was incorporated in 1936, and in the same year the two corporations were merged to form the present company. The merged corporation subsists by virtue of the laws of the State of Pennsylvania. The Penn-York Company is not a public utility.

The certificate of the Pennsylvania corporation provided: "The power to sell gas is expressly limited to the sale of such gas at the mouth of the well or place of production under private contract and at wholesale only; and provided further that this corporation shall not engage in any public service business within the meaning of the Pennsylvania Public Service Company Law or exercise the power of eminent domain for any purpose."

A contract dated July 23, 1938, was entered into between the Republic and Penn-York in which there was recited, among other things, that the Penn-York being the owner of certain gas leases and wells in the county of Potter, Pennsylvania, and also the owner of gas pipe lines extending from its field in the town of Harrison, county of Potter, in the State of Pennsylvania, to the Republic's distribution system in the town of

Alden, Erie county, New York, and the village of Forestville, Chautauqua county, New York, which pipe line was between ninety and ninety-five miles in length; and that the Republic being in need of gas the Penn-York agreed to sell at the mouth of the wells or place of production of gas in the State of Pennsylvania and to transport from Pennsylvania and to deliver to the Republic in New York its requirement of merchantable natural gas. Such delivery to the Republic to be through meters located near Forestville, Chautauqua county, New York, and in the town of Alden, Erie county, New York. The price to be paid therefor by the Republic to the Penn-York was forty-two cents per thousand cubic feet for all gas so delivered except first: for gas sold by the Republic to customers on its lines using large volumes of gas, second: gas furnished for industrial purposes being of the character of service known as " dump ", and third: natural gas furnished to public institutions located in the territory covered by its various franchises. These three classes were provided for at a different price in the contract. The contract provided for the manner and place of removal of the gas sold.

It was of importance to both contracting parties not only that there should be gas sufficient for the immediate demand of the Republic but that there should be gas in reserve or storage to meet the demands of the future and to provide against the time when all the wells would not produce all the gas required currently, therefore, without making any change in the contract to cover this precise situation, Penn-York began to run some of its gas to depleted or abandoned wells of Republic. The contract provided for the duty and obligation of the Penn-York to deliver at specific points and the obligation of the Republic to pay did not arise until delivery was complete. The gas was stored in the depleted or abandoned wells before reaching the point of delivery and when withdrawal was made from the stored gas the payment for the stored gas was made with the payment for gas currently taken. The line losses and losses in storage fell upon the Penn-York.

The contract was filed with the Commission and the Commission thereafter by an order dated September 8, 1938, instituted an investigation to determine whether such contract was in the public interest. Eight hearings were held before the Commission, nine hundred pages of testimony were taken and forty-four exhibits received in evidence.

The Commission on June 13, 1940, unanimously approved an opinion written by Commissioner Burritt which opinion con-

cluded as follows: " Because by its provision as well as by its omissions the contract lacks clarity and definiteness and is capable of misinterpretation; because the price charged has not been shown to be reasonable, and is in fact unreasonable; and since for these reasons it is not in the public interest, the contract should be disapproved.    *    *    *

"The above determination and recommendation is submitted upon the basis of facts of record for 1937 and 1938. The record contains some indication of trends and changed conditions of supply in 1939 and 1940, but no evidence of any change in cost. The burden of proof is on the company and it has not shown that the contract price was just and reasonable in 1938, or at any other time."

The Republic by a petition dated July 30, 1940, asked for an order directing a rehearing, specifying certain alleged errors in the Commission's opinion. On September 25, 1940, the Commission approved a memorandum submitted by Commissioner Burritt dismissing the petitioner's application for a rehearing.

The Commission instituted an investigation of the contract in accordance with subdivision 4 of section 110 of the Public Service Law (Cons. Laws, ch. 48), a portion of which is as follows: ". . . no charge for such electric energy and/or gas, whether made pursuant to contract or otherwise, shall exceed the just and reasonable charge for such electric energy and/or gas. In any proceeding to determine the reasonable cost of any such gas or electricity so sold and delivered or to be delivered to such purchaser the burden of proof shall be on the utility company purchasing the same. If it be found that any such contract or arrangement is not in the public interest, the commission, after investigation and hearing, is hereby authorized to disapprove such contract or arrangement."

Subdivision four does not differentiate or distinguish transactions with affiliates from transactions with any or all others, if the transactions be in the nature of contracts or arrangements for the purchase of gas. The subdivision provides that the public utility purchasing gas must purchase it at a just and reasonable price. If the price exceeds a just and reasonable one for such gas the contract may be found to be "not in the public interest" and the Public Service Commission has authority to disapprove of it.

The cost to the seller must enter into the consideration of the just and reasonable charge, but the cost to the seller is not necessarily the determinative factor. Whatever is a fair and just price to the seller is at least presumptively the fair and

just price which the public utility purchaser may pay. This language calls for the consideration of factors other than cost to the seller. Competitive conditions and market prices and proper provision for the future must be taken into account. The day to day costs are not the only costs to be considered. The charge is to be a just and reasonable charge, taking into account all of the things which enter into, or which are likely to enter into, the business of supplying gas over a period of time.

The decision began with the recital that the Republic and Penn-York are affiliates and therefore did not deal at arms length. The just and reasonable charge has to be considered and determined without reference to the fact that the parties to the contract are affiliates or non-affiliates. The rule for each and both is the same.

The opinion says that the contract between the Penn-York and the Republic was defective in that it failed to mention the important part of the arrangement between the two companies under which gas produced by the Penn-York in excess of current requirements of the Republic were placed in storage for use later when production might not come up to current requirements. It says further, "The failure to cover the storage arrangements in the contract had another important effect. It concealed from the Commission the fact that gas produced in excess of Republic's current needs was to be placed in storage, which fact, if revealed, would have removed the only basis on which the industrial and dump provisions could have been sustained * * *. If storage had been mentioned the dump provisions of the contract might have been held repugnant to the public interest on their face and the contract would have been subject to immediate rejection by the Commission for this cause alone."

Gas is produced under the law of capture so that in a competitive field it belongs to the producer who first gets it out of the ground. Every producer in a competitive field seeks to withdraw gas as fast as possible, before a competing producer gets it. The ownership of gas in storage did not affect the ultimate total cost of gas in the Republic's distribution system.

The decision calls the contract defective because it failed to provide for the storage of gas and said: " From a conservation standpoint it is inexcusable to waste potentially valuable natural gas by using it for purposes for which a lower grade fuel is equally satisfactory. The Commission has been reluctant to allow rate schedules which permit the sale of natural gas for industrial purposes at very low rates, or for boiler fuel or other

low grade uses at whatever price it will bring, although it has sometimes been led to do so by circumstances beyond its control.''

The Commission has such control only over the sale of natural gas produced within or without but sold within the State as is given to it by subdivision 2 of section 66 of the Public Service Law which confers the power of curtailing or discontinuing the use of natural gas for manufacturing or industrial purposes for periods aggregating not to exceed four months in any calendar year, if it is established to the satisfaction of the Commission that the supply of natural gas is not adequate to meet the reasonable demands of domestic consumption and may prohibit the use of natural gas in wasteful devices and practices.

The gas is stored while on its way to points of delivery and when delivered to the specified points it is billed and paid for just like the gas that has not been interrupted by storage.

The Public Service Commission has no power to determine that a contract for gas is not in the public interest simply if it provides or permits or if it results in gas being produced by the public utility being sold to an industry for industrial use. If the Commission assumes to have such power it must be based upon the grant to disapprove if the contract be found to be not in the public interest. The Commission is not given unlimited authority to declare for itself the matters and things which are and which are not in the public interest. If the contract does not exceed the just and reasonable charge for the gas it is in the public interest, if it does exceed the just and reasonable charge for the gas sold to the Republic by the Penn-York then it is contrary to the public interest and the Commission has authority to disapprove the contract. The just and reasonable charge as provided in subdivision 4 of section 110 is the determining factor as to whether the contract is in the public interest or is not in the public interest. The burden of proof as to the reasonableness of the price which the Republic has to pay to the Penn-York is upon the Republic company.

The decision says: ''Because the difference between the two companies is only one of corporate entity, the contract price for the gas should not exceed what the cost (including a fair return) would be had Republic developed the enterprise for its own purposes.

''The application of this test of reasonableness requires basic information as to the seller's property, and as to its operating expenses. If the test is to be properly applied, this data must be on the same basis as it would be if the purchaser were itself

producing the gas and these costs and expenses were recorded on its own books. This, of course, would be in accordance with the provisions of the Uniform System of Accounts prescribed by the Commission for Gas Corporations.''

The opinion says: ''There is certainly no justification for depleting the supply in storage by sales for low grade uses. Republic should revise its rate schedules to eliminate therefrom any provisions which tend to encourage the wasteful use of gas for low grade uses.''

The question of the schedules of the Republic was not before the Commission. The question before the Commission was simply one as to the contract between the Republic and Penn-York and the decision goes out of the way to discuss many matters that were not relevant to the question before it.

The decision further says: ''Accordingly, the seller's accounts were examined by Mr. Rausch, an accountant on the Commission's staff, who testified that certain adjustments would be necessary to bring them into conformity with the Uniform System of Accounts so that they could be used in such a cost determination.''

The Commission treated all of the capital property, all of the investment, and all of the earnings and all of the expenses as if they were those of the Republic company; which had itself initiated and carried on the ventures in which the Penn-York engaged. The Penn-York is a business corporation, organized under the law applicable to business corporations. The Commission took all of the Penn-York accounts, which entered into the computation of the cost of gas, and made them over to conform to the Uniform Classification of Accounts for public utilities which it had no right to do. The Penn-York's price that it was asking for gas was to be determined on its financial setup and not upon some fancied setup upon the Uniform System of Accounts which the Republic would have had to have followed if it had gone forward.

The deduction of five per cent engineering fees paid to either Cities Service or H. L. Doherty & Company for mains constructed in New York State or mains constructed in Pennsylvania was a proper and reasonable charge and should not have been deducted by the Commission. Mr. Eastman, an expert, fully qualified by the record, was examined as to this charge and he testified that a five per cent charge was a fair and reasonable charge in the market, charged by independents. There was no other evidence given. The evidence was rejected arbitrarily by the Commission as not being proof of the value of the service.

It was proof by an expert, who was fully qualified and who showed that he knew what that sort of service was worth, that it was a reasonable fee, and therefore that fee should not have been deducted. There was no question about the work being done or the amount of it and the Commission was in error when it said that this evidence did not constitute proof.

The Commission has found that twenty-four cents per thousand cubic feet shows a reasonable contract price for gas between the two affiliated companies. Whether the companies are affiliated or not makes no difference under the provisions of the law. The price found by the Commission is not supported by the evidence in the case because it is established by the evidence without contradiction that the actual charge for gas paid by the Republic to the Penn-York per thousand cubic feet delivered was as follows: 1937 — $.4113; 1938 — $.3803; 1939 — $.3350.

This gas had to be transported from ninety to ninety-five miles through a pipe line built by the Penn-York at a large cost. The Republic was paying on the average to local independents, twenty-nine cents per thousand cubic feet, in cases where the independents were located directly at the pipe line. The Penn-York paid the Cabot Corporation, which was an independent, thirty-five cents per thousand cubic feet during this time and the Republic paid fifty-two and a half cents minimum for ten years to the Iroquois, which was an independent. These figures when compared with the twenty-four cents per thousand cubic feet figure taken by the Commission as being a reasonable contract price between the two affiliated companies does not stand the test of the proof in the case.

The orders and determination of the Public Service Commission here under review should be annulled on the law and the facts with fifty dollars costs and disbursements to the petitioner.

FOSTER, J. (dissenting). I dissent. There was, in my opinion, evidence to sustain the finding of the Commission that the price charged by Penn-York to Republic was not shown to have been just and reasonable. There must be some limit as to what may be fairly included in determining the reasonable cost to Penn-York, and Republic had the burden of proof as to this issue. The Commission was not bound to accept as the final and determinative factor in ascertaining such cost the total cost to Penn-York of acquiring some 600,000 acres of leaseholds, over a wide area and without consideration as to whether such leaseholds could be economically used to supply Republic with gas. The evidence

supports the inference at least that this huge acreage of leaseholds was acquired for speculative purposes originally, and in the furtherance of a plan wholly unrelated to supplying Republic with gas. The collapse of the plan does not justify placing the burden of such speculative expense on Republic under the guise of cost. Because Penn-York is a business corporation does not permit it to rely wholly on the cost practices of the market place in its relation with a public utility, which is also an affiliate. In its decision, determinative of the cost of gas to Penn-York, the Commission has included all of the leaseholds which the latter still holds, whether productive or not. This treatment was as liberal as Penn-York could expect under the circumstances.

The decision should be confirmed.

HILL, P. J., and SCHENCK, J., concur with CRAPSER, J.; BLISS, J., concurs in the result; FOSTER, J., dissents, in opinion.

Orders and determination of the Public Service Commission annulled on the law and facts with fifty dollars costs and disbursements to petitioner and matter remitted to the Public Service Commission.