Charles T. MILLER, Plaintiff-Appellee,

v.

NYS PUBLIC SERVICE COMMISSION and Jamaica Water Company, Defendants-Appellants.

Nos. 179, 266, Docket 86–7462, 86–7464.

United States Court of Appeals, Second Circuit.

Argued Oct. 10, 1986.

Decided Dec. 8, 1986.

---

3. *See* Note 1, *supra,* Art. I(2), (3).

Arthur B. Cohn, New York City (David E. Blabey, Public Service Commission of the State of N.Y., Albany, N.Y., of counsel), for defendant-appellant NYS Public Service Com'n.

Howard J. Read, Albany, N.Y. (Read and Laniado, Albany, N.Y., John W. Sinon, P.C., Williston Park, N.Y., of counsel), for defendant-appellant Jamaica Water Co.

Charles T. Miller, pro se.

Before LUMBARD, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

The New York State Public Service Commission (PSC) and the Jamaica Water Company (Jamaica) appeal from a judgment of the United States District Court for the Eastern District of New York (Bramwell, J.) entered in favor of Charles T. Miller, *pro se*, in the amount of $59.31, plus $100 in costs and fees in his civil rights action filed pursuant to 42 U.S.C. § 1983.

This case arises because Miller objects to a rate he was charged for a water hose connection that he could not lawfully use because of a drought emergency in New York City. Unable to carry the day before the Public Service Commission, which had authorized imposition of the objected-to rate, the *pro se* plaintiff turned to the federal district court. The district court accepted jurisdiction and ordered a refund of the hose charge plus costs and fees, reasoning that the Johnson Act of 1934, 28 U.S.C. § 1342 (1982)—which has excluded federal courts from enjoining compliance with any order affecting State public utility rates for over 50 years—did not expressly prohibit an award of compensatory damages. While the district court's attempt to unsnarl this bureaucratic snafu for the benefit of the *pro se* plaintiff may be laudable, no lawful basis for it to act exists. Thus, we must reverse.

I

We set forth the facts briefly. Miller's federal action against the PSC, the New York State utility regulating agency, and Jamaica, a public water utility servicing parts of Queens and Nassau County, New York, arose over a dispute concerning his water bill. Miller claimed that through September 1984 he had not been billed by Jamaica for water, and filed a complaint with the PSC to determine the amount he owed for service up to that date. In October 1984 Jamaica sent Miller a bill for $720, which Miller contested as being incorrect, and which the PSC also found to be in error. An agreement was reached on the amount due, and Miller commenced paying in monthly installments. While the record before us is not clear as to the precise details, disputes later arose between Miller and Jamaica over the amount of a subse-

quent bill sent by Jamaica, an allegedly promised adjustment to this bill that was not made, and an arrangement Miller made with his bank for it to transfer $50 monthly from his checking account to Jamaica.

Claiming it never received payment, Jamaica terminated Miller's service without notice. When Miller complained to the PSC, he was advised that Jamaica had no record of payments for the months from February to June 1985. Dissatisfied with this response, Miller commenced an Article 78 proceeding in New York State Supreme Court. That action subsequently was dismissed, without prejudice, because Miller had failed to exhaust his administrative remedies. Finally, Miller claims that Jamaica and the PSC held an "informal hearing" regarding his complaint during October 1985 without notifying him.

The instant suit was commenced in federal court in the Eastern District on January 15, 1986. In his complaint Miller sought a declaratory judgment which would: (1) order the PSC to provide him with a formal hearing, (2) find that Jamaica did not properly credit his account with money received from his bank through electronic fund transfer authorizations, and (3) hold Jamaica liable for all expenses resulting from the termination of his water service. Miller also requested a permanent injunction to prevent Jamaica from terminating his water service and $500,000 in damages.

Judge Bramwell signed a show cause order together with a temporary restraining order enjoining Jamaica from terminating Miller's water service pending determination of the show cause order. The PSC responded by placing a "withhold" on Miller's account that prevented termination of his service during the pendency of the PSC's investigation, and asked the district court to take no action until that investigation was complete. Jamaica answered the complaint on February 5, 1986 and denied generally Miller's allegations. The answer admitted that Jamaica sent Miller a $750 bill in October 1984, received a $50 payment in April 1985 from Miller's bank, attended an informal meeting with the PSC

in October 1985, and notified Miller that his service would be terminated unless he paid $438.42 in overdue charges. As an affirmative defense Jamaica asserted that the PSC had sole jurisdiction over the action and that Miller's complaint should be dismissed.

## II

At a hearing held February 20, 1986 the district court directed the parties to resolve Miller's bill and to report back on April 3. On March 13 the PSC wrote Judge Bramwell that the parties had agreed to a 25% reduction in the statement but that Miller requested a further reduction of his bill to reflect the elimination of a hose connection charge. The hose connection charge has been in effect for many years and Jamaica and the PSC opposed its elimination. Miller stated that because of a drought in 1985, New York City had prohibited the use of outside hoses during the summer months. While the prohibition did not affect customers with meter service who pay for the water they actually use, those customers who pay a flat rate—including Miller—continued to be charged the same amount. Miller argued that he should not be charged for a service he could not legally use. Jamaica stated that it had initiated the hose charge with PSC authorization and the PSC responded that, after considering the issue, it had decided that no reduction in the hose charge was warranted.

At the April 3rd meeting with the district court the parties presented the proposed agreement as well as their arguments regarding the hose charge. The judge ordered a refund to Miller of $59.31, representing the cost of the 1985 hose charge, and also awarded him $100 in costs and fees. The PSC filed a motion for reconsideration, arguing that the judgment should be vacated and the action dismissed in accordance with 28 U.S.C. § 1342. The district court concluded that § 1342 did not deprive it of jurisdiction because it had not entered an injunction or restraining order. The PSC and Jamaica appeal primarily on

the ground that the district court had no jurisdiction to entertain this matter. We agree.

## III

The Johnson Act of 1934, 28 U.S.C. § 1342, reads:

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a ratemaking body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

The PSC and Jamaica claim that Miller's case falls squarely within the interdiction of § 1342 and that, therefore, the district court lacked subject matter jurisdiction. Except for the question of whether § 1342 bars a district court from granting damages to claimants, the case otherwise meets all of § 1342 requirements. The hose connection charge is an "order affecting rates" instituted by Jamaica with PSC approval. *See* N.Y.Pub.Serv.Law, §§ 89–c(4) and e(2) (McKinney 1955 & Supp.1986). Miller based his claim on deprivation of his federal constitutional rights. It is undisputed that the hose charge affects only intrastate commerce. The PSC gave notice and held public meetings on the application of the hose charge during the prohibited months of 1985, and Miller has a plain, speedy and efficient remedy in the courts of New York State. Hence, the only question remaining is whether the district court had jurisdiction to grant Miller damages in the form of a reimbursement of the hose charge.

## IV

### A. *Decisional Law*

We have not had occasion to address whether a district court has jurisdiction to grant compensatory damages to a public utility customer. In other circuits the statute has been construed broadly to oust federal courts of jurisdiction over all challenges affecting rates. *Hanna Mining Co. v. Minnesota Power & Light Co.,* 739 F.2d 1368, 1370 (8th Cir.1984); 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4236 (1978). The prohibition against federal court jurisdiction has been extended to the granting of a declaratory judgment alone or along with monetary damages as a form of relief. *See Tennyson v. Gas Service Co.,* 506 F.2d 1135, 1139 (10th Cir. 1974); *Mountain Fuel Supply Co. v. Shell Oil Co.,* 533 F.Supp. 40, 42 (D.Utah 1981); *Bridgeport Hydraulic Co. v. Council on Water Company Lands,* 453 F.Supp. 942, 954 (D.Conn.1977) (three-judge court), *aff'd mem.,* 439 U.S. 999, 99 S.Ct. 606, 58 L.Ed.2d 674 (1978); *Klotz v. Consolidated Edison Co.,* 386 F.Supp. 577, 585 (S.D.N.Y. 1974).

The unambiguous language of the statute supports this interpretation. An award of damages refunding a state agency-approved utility charge plainly would "restrain the operation of, or compliance with [an] order [of a state rate-making body] affecting rates." As the Tenth Circuit in *Tennyson* points out, a decision on the merits of a claim for monetary relief "would of necessity involve our decision as to the same issues proscribed by the Johnson Act." 506 F.2d at 1139. Also, *Tennyson* analogized § 1342 to 28 U.S.C. § 1341, which limits federal jurisdiction in cases concerning the validity of state taxes. Noting the parallel language and history of the two statutes, the court reasoned that the Supreme Court's interpretation of § 1341 to cover non-injunctive relief in *Great Lakes Dredge & Dock Co. v. Huffman,* 319 U.S. 293, 298–99, 63 S.Ct. 1070, 1073–74, 87 L.Ed. 1407 (1943) could be ap-

plied equally to § 1342.[1] We find this analogy persuasive.

### B. *Legislative History of the Act*

The legislative history of the Johnson Act also supports a reading of the statute that would prohibit an award of compensatory damages. Justice Frankfurther thoroughly traced the subject of federal court intervention in state regulatory matters in his concurring opinion in *Alabama Public Service Commission v. Southern Railway*, 341 U.S. 341, 355–59, 71 S.Ct. 762, 771–73, 95 L.Ed. 1002 (1951). Rate orders and taxation were the "two fields where the greatest dissatisfaction with federal jurisdiction existed." *Id.* at 358, 71 S.Ct. at 773. Little by little those grants of power held by federal courts were cut away until the Johnson Act was passed by Congress, Act of May 14, 1934, 48 Stat. 775. Three years later Congress passed § 1341, Act of Aug. 21, 1937, 50 Stat. 738, which withdrew federal jurisdiction over suits to enjoin "the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.

Section 1342 was introduced in the United States Senate by Senator Hiram Johnson and had as its object "the taking away of jurisdiction of Federal district courts to enjoin, suspend or restrain" compliance with any order affecting rates charged by a public utility. S.Rep. No. 125, 73rd Cong., 1st Sess. 2 (1933). Senator Johnson stated that under existing law, utility companies, permitted to litigate in the state courts and later in federal courts, could take "two bites at a cherry," and that such a law led to interminable delay and injustice. 78 Cong.Rec. 8335 (1934). The Johnson bill sailed through the Senate.

No doubt, the evil at which the bill was directed was the practice of utility companies in seeking injunctions in federal courts to restrain the enforcement of state approved utility rates. Congress's concern with the problem of these injunctions was so acute that the bill was called, at times, an "anti-injunction bill". 78 Cong.Rec. 8427 (1934). But the Congressional debate makes clear that the aim of Congress was to remove completely the subject of utility rates from the federal courts.

The debate in the House focused on the Lewis Amendment which sought to cure the specific ills identified in the Senate Report on the Johnson bill without depriving the federal courts of jurisdiction entirely. The amendment addressed two key problems: first, that federal courts, because they were unable to admit into evidence the findings and conclusions of the state regulatory agencies, reconsidered issues de novo, duplicating and ignoring the work of the state rate commissions; and, second, that the utility companies would forum shop by commencing actions concurrently in federal and state courts and then dismissing the action in the forum that appeared less favorably disposed. *Id.* at 8327 (statement of Rep. Lewis). The amendment eliminated concurrent jurisdiction in utility cases, forcing litigants to commence their actions in only one forum, and authorized federal courts to take the findings and conclusions of the state commissions into evidence. *Id.* at 8326–27.

The House rejected the Lewis Amendment after a two-day debate during which opposition towards all federal jurisdiction in utility cases was voiced. Congressman O'Connor of New York, the floor manager of the Johnson bill, argued against the Lewis amendment saying that State courts were good enough for New York. *Id.* at 8322. Congressman Mapes of Michigan spoke in favor of allowing the states "to perform their proper functions in the supervision and fixing of rates, without interference of Federal law." *Id.* at 8324. Con-

---

**1.** Although the Supreme Court in *Great Lakes Dredge & Dock Co.* viewed § 1341 to require a "restraint in the use of the declaratory judgment procedure," it did not find it necessary to construe the statute so as to *prohibit* a declaratory judgment challenge to the constitutionality of state tax laws. 319 U.S. at 299, 63 S.Ct. at 1073. Any doubt that § 1341 prohibits declaratory judgments in federal courts on this subject has been removed recently by *California v. Grace Brethren Church*, 457 U.S. 393, 408, 102 S.Ct. 2498, 2507, 73 L.Ed.2d 93 (1982).

gressman Hancock of New York, in opposing the Johnson bill, stated that it would divest the federal courts "of all jurisdiction in public-utility cases." *Id.* at 8419. Congressman McGugin of Kansas railed against the interference by "injunction *and other orders* from the inferior federal courts." *Id.* at 8337 (emphasis added). Congressman Kurtz of Pennsylvania, in answer to a question, agreed that "all the doors of the Federal Courts will be closed." *Id.* at 8423. Congressman Lewis of Colorado expressed the sense of those supporting the Johnson bill when he commented: "The Johnson bill absolutely abolishes the jurisdiction of the United States courts in rate cases, and in rate cases only." *Id.* at 8328. The Lewis amendment was voted on first by the House and soundly defeated. The Johnson bill was then taken up and passed overwhelmingly. The Senate accepted the bill returned to it by the House with a minor word change and enacted the Johnson Act on May 14, 1934.

We believe this legislative history of the Johnson Act makes clear that jurisdiction affecting those rates charged by Jamaica, and set by the PSC, does not lie in the district court. The abolition of jurisdiction in the federal courts extends not only to injunctions and declaratory judgment actions, but must read to reach broadly over all jurisdiction in rate cases, including the awarding of monetary damages. Further, a narrower reading of the statute to cover only injunctive relief would render the statute a nullity, allowing rate-payers to use class actions and the doctrine of collateral estoppel to restrain the imposition of rates just as effectively as an action for injunctive relief.

## V

Accordingly, whatever rights Miller may have with regard to the hose connection charge should be pursued in the State courts of New York. In light of our opinion, it is unnecessary to address appellants' other contentions. The order appealed from is reversed and the case remanded to the district court with directions to dismiss Miller's *pro se* complaint for lack of federal subject matter jurisdiction. The parties to this appeal will each bear their own costs.

Reversed and complaint dismissed.