950 F.2d 829
 NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Plaintiff-Appellee,
Public Service Commission of the State of New York,
Plaintiff-Intervenor-Appellee,
v.
TGX CORPORATION and Paragon Resources, Inc., Defendants-Appellants.
 No. 1524, Docket 91-7127.
 United States Court of Appeals,
Second Circuit.
 Argued May 20, 1991.
Decided Dec. 3, 1991.
 
 Joe H. Foy, Houston, Tex. (Bracewell & Patterson, Houston, Tex., Allan R. Lipman, Kavinoky & Cook, Buffalo, N.Y., of counsel), for defendants-appellants.
 Robert E. Glanville, Buffalo, N.Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, Heino H. Prahl, of counsel), for plaintiff-appellee.
 Jonathan D. Feinberg, Asst. Counsel, Public Service Com'n of the State of N.Y., Albany, N.Y. (William J. Cowan, Gen. Counsel to Public Service Com'n of the State of N.Y., of counsel), for plaintiff-intervenor-appellee.
 Before KEARSE, MAHONEY and SNEED,* Circuit Judges.
 MAHONEY, Circuit Judge:
 
 
 1
 Defendants-appellants TGX Corp. ("TGX") and Paragon Resources, Inc. ("Paragon") appeal from a judgment of the United States District Court for the Western District of New York, John T. Elfvin, Judge, entered January 18, 1991, 749 F.Supp. 466. The judgment of the district court declared void a certain gas purchase agreement between TGX and plaintiff-appellee National Fuel Gas Distribution Corp. ("NFG") as a result of a determination by plaintiff-intervenor-appellee Public Service Commission of the State of New York (the "PSC").
 
 
 2
 We reverse and remand.
 
 Background
 
 3
 On July 1, 1974, Iroquois Gas Corporation ("Iroquois") entered into a contract (the "Contract") with Paragon for the purchase of gas from Paragon's gas wells in Chautauqua County, New York. Iroquois promptly assigned its interest in the Contract to NFG. The Contract entitled NFG to the gas produced by Paragon for the life of Paragon's wells.
 
 
 4
 Paragraph VII of the Contract sets different base prices for the summer and winter months, and contemplates an annual increase in those prices. The increase is the average increase in prices paid by NFG to its three principal interstate gas pipeline suppliers during the preceding calendar year (the "three-pipeline escalator") or $0.02 per thousand cubic feet, whichever is greater.
 
 
 5
 Given the regulatory framework in which utilities operate, the parties provided for the possibility of regulatory interference with the Contract. Paragraph XV(A) provides that the Contract "shall be subject to all valid applicable state and federal laws and orders, directives, rules and regulations of any governmental body or official having jurisdiction." Paragraph XV(C) states in pertinent part:
 
 
 6
 If any governmental order, directive, rule or regulation or any state or federal law now in effect or hereafter enacted, issued or promulgated prohibits the sale by Seller to Buyer of gas hereunder at the applicable price provided in Article VII, ... then in any such event, Seller may at its option either:
 
 
 7
 1. Continue sales of gas hereunder at the price permitted by such order, directive, rule, regulation or law;
 
 
 8
 2. Suspend the sales of gas hereunder during the period such order, directive, rule, regulation or law remains in effect; or
 
 
 9
 3. Cancel and terminate this Agreement insofar as the same covers and relates to the gas affected thereby and purchase the [field segment gathering system installed by Buyer for the purchase of Seller's gas reserves] pursuant to Paragraph VII(A)(c) [of the Contract].
 
 
 10
 Following formation of the Contract, a number of events occurred that impact upon the price controversy which is at the core of this litigation. Initially, NFG filed the Contract with the PSC in 1974. In subsequent proceedings, the PSC rejected the three-pipeline escalator as a measure for costs that NFG could pass through to its customers. Instead, the PSC proposed an alternative escalation clause (the "FPC escalator") that included a price "cap" of 90% of the average price of No. 6 fuel oil in NFG's service area for the previous twelve-month period. The FPC escalator was incorporated in subsequent NFG gas purchase contracts, but never made part of the Contract.
 
 
 11
 In 1978, NFG began to reduce its payments to Paragon for prior years to reflect refunds paid to NFG, pursuant to federal requirements, by the pipeline companies whose charges constituted the three-pipeline escalator. Paragon then filed suit in the United States District Court for the Western District of Louisiana alleging breach of the Contract.[1] See Paragon Resources, Inc. v. National Fuel Gas Distribution Corp., 695 F.2d 991, 995 (5th Cir.1983). The district court held that NFG must make payments pursuant to the three-pipeline escalator, without reference to any refunds the three pipeline companies might make to NFG. See id. at 992. This judgment was upheld on appeal. See id. at 999-1000.
 
 
 12
 In 1978, the Natural Gas Policy Act ("NGPA"), 15 U.S.C. § 3301 (1988) et seq., became effective, subjecting the Contract to federal regulation under the NGPA. TGX asserts that its predecessor-in-interest, Paragon, invoked paragraph XV(C) of the Contract and elected to continue with the Contract using an NGPA pricing scheme, resulting in an NGPA-imposed limitation upon the three-pipeline escalator. See 15 U.S.C. § 3315(b)(1) (1988). NFG concedes that NGPA prices were charged at least since 1981.
 
 
 13
 In early 1983, NFG sought PSC approval to pass costs arising out of the Louisiana litigation through to its consumers via increased rates. According to an affidavit of the secretary of the PSC, neither Paragon nor TGX was a party to the resulting proceeding, or received notice from the PSC either of the proceeding, or of the opinion and order issued at its conclusion. Further, the various notices of the proceeding made no mention of the Contract.
 
 
 14
 PSC staff proposed in the proceeding that "a more market-oriented alternative to the three-pipeline escalator be 'imputed' into the local production contracts [including the Contract]." Specifically, PSC staff proposed that NFG be required to replace the three-pipeline escalator with the FPC escalator for ratemaking purposes. TGX was not notified by either NFG or the PSC that this proposal was being considered. NFG responded to the PSC staff suggestion by arguing that if the PSC were to reject the three-pipeline escalator, it should "disapprove" the affected contracts (including the Contract) to "save[ ] the utility harmless from breach of contract claims on the part of the producer." TGX was not notified by either NFG or the PSC that this suggestion had been made.
 
 
 15
 On December 20, 1983, the PSC issued its opinion and order (the "PSC Order") on NFG's request for increased rates. In an eighty-eight page opinion, the PSC considered a range of issues not germane to this appeal. Addressing the Contract, the PSC Order rejected a staff proposal to "rewrite [the Contract] to include a ceiling on gas cost recoveries" as potentially incompatible with N.Y.Pub.Serv.Law § 110(4) (McKinney 1989), and instead determined "simply to disapprove" the Contract pursuant to that provision.[2]
 
 
 16
 In a letter dated January 3, 1984, NFG notified TGX that the PSC had issued the PSC Order, which "purports to 'disapprove' the '3-pipeline escalator' contracts, pursuant to Public Service Law Section 110(4)." The letter went on to quote at length the "operative portions" of the PSC Order, but omitted the emphasized sentence, see supra note 2, which asserted NFG's apparent belief that PSC disapproval would enable NFG to rescind the Contract. NFG stated its
 
 
 17
 present intention to petition the Commission for rehearing or, in the alternative, clarification of so much of Opinion No. 83-26 as relates to the "disapproval" of the "3-pipeline escalator" contracts. Further, it is the company's present intention to seek judicial review of that portion of Opinion No. 83-26, in the event that the Commission's response to the company's application for rehearing or clarification is unsatisfactory.
 
 
 18
 Instead of seeking rehearing or clarification, however, NFG initiated an Article 78 proceeding in New York state court against the PSC seeking review of the PSC Order. TGX filed an amicus curiae brief endorsing NFG's position and contending that the PSC should not be permitted to disapprove the previously approved contracts (including the Contract). In response, the PSC argued, inter alia, that the PSC Order had cancelled the Contract. The Appellate Division, Third Department, upheld the PSC's "disapproval" of the local production contracts because of their inclusion of the three-pipeline escalator clause, but did not address the impact of that disapproval upon the parties to those contracts. See National Fuel Gas Distribution Corp. v. Public Serv. Comm'n, 107 A.D.2d 357, 358-59, 487 N.Y.S.2d 150, 151 (3d Dep't), aff'd mem., 66 N.Y.2d 956, 489 N.E.2d 767, 498 N.Y.S.2d 798 (1985).
 
 
 19
 Meanwhile, NFG had commenced the instant action on November 30, 1984, but did not pursue it actively during the pendency of the Article 78 proceeding.[3] NFG sought declaratory relief from the Contract based upon the PSC Order, as well as relief regarding the rights of the parties with respect to a "take or pay" provision set forth in paragraph V(a) of the Contract in view of the asserted termination of the Contract. TGX counterclaimed for damages resulting from breach of the three-pipeline escalator and "take or pay" provisions of the Contract, and a declaratory judgment generally corresponding to its contentions on this appeal. The district court thereafter issued numerous rulings responding to the various contentions of the parties.
 
 
 20
 In a memorandum and order entered October 1, 1987, the district court ruled that the PSC Order had voided the three-pipeline escalator clause. In a memorandum and order entered December 12, 1988, the district court declared that because the PSC Order had abrogated the price term, an essential term of the Contract, it had voided the Contract. In a memorandum and order entered May 11, 1990, the court held that the Johnson Act, 28 U.S.C. § 1342 (1988), did not divest the district court of jurisdiction over this action. In a memorandum and order entered November 7, 1990, the court ruled that TGX had not been denied due process in the PSC proceedings in view of subsequently available procedures, including the Article 78 proceeding. In a memorandum and order entered January 17, 1991, the court directed entry of a judgment, pursuant to Fed.R.Civ.P. 54(b), that the Contract be declared void as of December 20, 1983 (the date of the PSC Order). Judgment to that effect was entered on January 18, 1991.
 
 
 21
 This appeal followed.
 
 Discussion
 TGX advances four arguments on this appeal:
 
 22
 (1) the Johnson Act, 28 U.S.C. § 1342 (1988), partially divests the district court of subject matter jurisdiction in this lawsuit, which concerns state utility ratemaking;
 
 
 23
 (2) the PSC lacked statutory authority under New York law to review the Contract because it is between NFG, a utility, and TGX, an unaffiliated private supplier;(3) assuming that TGX is bound by the PSC Order, the PSC determination merely voided the price term of the Contract, thus permitting the Contract to continue in effect under a valid price scheme; and
 
 
 24
 (4) assuming that the PSC Order voided the entire Contract, TGX should not be bound by the order because TGX was not accorded procedural due process, i.e., notice and an opportunity to be heard, prior to the PSC determination.
 
 
 25
 In addition, NFG and the PSC argue that in view of TGX's participation in the Article 78 proceeding as an amicus curiae, TGX may not collaterally attack the validity of the PSC Order.
 
 
 26
 As will appear, we rule that the Johnson Act did not divest the district court of subject matter jurisdiction, and that New York law authorized the PSC to review the Contract. We also conclude that the PSC voided the Contract's price term, but not the entire Contract, thereby allowing TGX to invoke a provision of the Contract created for just such a contingency. We therefore have no occasion to address the due process issue. Cf. Rust v. Sullivan, --- U.S. ----, 111 S.Ct. 1759, 1771, 114 L.Ed.2d 233 (1991) (saving construction of statute preferable, where fairly possible, to ruling on constitutionality); United States v. Monsanto, 924 F.2d 1186, 1200 (2d Cir.) (in banc) (same), cert. denied, --- U.S. ----, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991). Finally, we determine that TGX's participation as an amicus curiae in the Article 78 proceeding did not bar TGX from challenging the PSC Order in this litigation.
 
 
 27
 At the outset, however, we briefly consider our jurisdiction to hear this appeal. NFG asserted claims, and TGX responded with counterclaims, addressing the rights and obligations of the parties regarding the "take or pay" provision of the Contract. These claims and counterclaims have not been resolved, but the district court has determined, pursuant to Fed.R.Civ.P. 54(b), that an immediate appeal should be allowed concerning its declaratory judgment that the Contract was voided by the PSC Order. The court explained:
 
 
 28
 Because the invalidity vel non of the Gas Purchase Agreement after December 20, 1983 determines any subsequent liabilities arising out of the "take-or-pay" clause, and because the defendants have declared their intention to appeal this Court's decision regarding the validity of the Gas Purchase Agreement after December 20, 1983, this Court finds it expeditious to leave unresolved the "take-or-pay" issue until such time as the United States Court of Appeals for the Second Circuit finally determines the contract validity question.
 
 
 29
 We agree with that determination. This litigation is already protracted, TGX is in chapter 11, and, as the district court recognized, the rights and obligations of the parties under the "take or pay" provision of the Contract cannot be addressed intelligently without resolving the threshold question of the Contract's continuing validity in the aftermath of the PSC Order. See Harriscom Svenska AB v. Harris Corp., 947 F.2d 627, 629 (2d Cir.1991).
 
 
 30
 We turn to the contentions of the parties.
 
 
 31
 A. The Johnson Act.
 
 
 32
 We address first the threshold issue whether the Johnson Act deprived the district court of subject matter jurisdiction over this litigation. TGX contends on appeal that it was a violation of the Johnson Act, "[a]t least with respect to an arm's length contract between a regulated public utility and an unregulated supplier," for the district court to "compel[ ]" the PSC, "if it disapproves the contract for ratemaking purposes, to cancel the contract."
 
 The Johnson Act provides:
 
 33
 The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
 
 
 34
 (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,(2) The order does not interfere with interstate commerce; and,
 
 
 35
 (3) The order has been made after reasonable notice and hearing; and
 
 
 36
 (4) A plain, speedy and efficient remedy may be had in the courts of such State.
 
 
 37
 28 U.S.C. § 1342 (1988).
 
 
 38
 Although the Johnson Act is to be construed broadly, see Miller v. NYS Pub. Serv. Comm'n, 807 F.2d 28, 33 (2d Cir.1986), both the language and the legislative history of the statute make clear that "its purpose was to prevent public utilities from going to federal district court to challenge state administrative orders or avoid state administrative and judicial proceedings." California v. Grace Brethren Church, 457 U.S. 393, 409 n. 22, 102 S.Ct. 2498, 2508 n. 22, 73 L.Ed.2d 93 (1982); see also Miller, 807 F.2d at 31 (statute "construed broadly to oust federal courts of jurisdiction over all challenges affecting rates"). No such challenge is presented in this lawsuit, which NFG initiated to effectuate the PSC Order, and in which (1) the PSC intervened as a plaintiff supporting NFG's position, and (2) TGX's defense does not challenge the efficacy of the PSC Order insofar as it determines the rates that NFG may charge to its customers.
 
 
 39
 B. PSC Authority to Review the Contract.
 
 
 40
 The PSC derives its authority in this matter from N.Y.Pub.Serv.Law § 110(4) (McKinney 1989), quoted supra in note 2. By its plain language, section 110(4) would appear to apply to all written contracts by public utilities for the purchase of gas, including but not limited to contracts with affiliated interests. TGX contends, however, that only contracts for the purchase of gas between public utilities and affiliated interests fall within the purview of section 110(4), pointing, inter alia, both to the title of section 110 ("Control of holding companies and of transactions between affiliated interests"), and to General Tel. Co. v. Lundy, 17 N.Y.2d 373, 218 N.E.2d 274, 271 N.Y.S.2d 216 (1966).
 
 
 41
 The argument from the section title is clearly unavailing. As the New York Court of Appeals said, responding to an analogous contention, in Squadrito v. Griebsch, 1 N.Y.2d 471, 475, 136 N.E.2d 504, 506, 154 N.Y.S.2d 37, 40 (1956), "there can be no doubt that the text of the statute must take precedence over its title. While a title or heading may help clarify or point the meaning of an imprecise or dubious provision, it may not alter or limit the effect of unambiguous language in the body of the statute itself." See also Rivers v. Sauter, 26 N.Y.2d 260, 262, 258 N.E.2d 191, 192, 309 N.Y.S.2d 897, 898 (1970) (similar ruling as to title of article including statutory provision).
 
 
 42
 We also disagree with TGX's reading of Lundy. That case involved an appeal from a rate proceeding in which the PSC found that the utility was being overcharged for goods and services by an affiliate. The Court of Appeals addressed subdivisions (3) and (4) of section 110 in that context,[4] stating:
 
 
 43
 [I]t is only an agreement between affiliates for "management, construction [or] engineering" services or for the "purchase of electric energy and/or gas" which need be filed by a [utility] for [PSC] approval. (Public Service Law, Consol.Laws, c. 485, § 110, subds. 3, 4; see Matter of International Ry. Co. v. Public Service Comm., 264 App.Div. 506, 36 N.Y.S.2d 125 [1942], affd. 289 N.Y. 830, 47 N.E.2d 435 [1943].) In every other instance, the commission is powerless to impair the obligation or otherwise invalidate a utility's contract....
 
 
 44
 17 N.Y.2d at 378-79, 218 N.E.2d at 277-78, 271 N.Y.S.2d at 221.
 
 
 45
 While the final sentence of the foregoing quotation might be read, in isolation, as confining the PSC's disapproval authority under section 110(4) to contracts for the purchase of gas between a public utility and an affiliate, such an interpretation would ignore the context in which the Court of Appeals spoke. The court was engaged in a general discussion of the regulation of contracts between utilities and their affiliates under New York law, and should not be understood as having provided a rule for nonaffiliates, en passant, that is at odds with the plain language of section 110(4).
 
 
 46
 Furthermore, another New York case has more directly addressed this question. In In re Republic Light, Heat & Power Co., 265 A.D. 74, 38 N.Y.S.2d 302 (3d Dep't 1942), the court reviewed the PSC's disapproval, pursuant to section 110(4), of a contract between a utility and an affiliated gas supplier for the purchase of gas. In doing so, the court said:
 
 
 47
 The decision [of the PSC] began with the recital that the Republic and Penn-York are affiliates and therefore did not deal at arms length. The just and reasonable charge has to be considered and determined without reference to the fact that the parties to the contract are affiliates or non-affiliates. The rule for each and both is the same.
 
 
 48
 265 A.D. at 79, 38 N.Y.S.2d at 307 (emphasis added).[5]
 
 
 49
 We note, in addition, that the PSC Order was upheld in the New York state courts through the Article 78 proceeding. See National Fuel Gas Distribution Corp. v. Public Serv. Comm'n, 107 A.D.2d 357, 487 N.Y.S.2d 150 (3d Dep't), aff'd mem., 66 N.Y.2d 956, 489 N.E.2d 767, 498 N.Y.S.2d 798 (1985). A necessary, albeit implied, premise of that affirmance was the proposition that section 110(4) authorized the PSC to review the Contract. Finally, a contrary ruling by this court would be subject to serious question under the Johnson Act.
 
 
 50
 We conclude that the PSC properly exercised its authority under section 110(4) in reviewing the Contract.
 
 
 51
 C. The Effect of the PSC Order on the Contract.
 
 
 52
 Having concluded that the PSC had jurisdiction to review the Contract, the issue remains whether the PSC Order impacted solely upon the price term of the Contract, as TGX asserts, or operated to cancel the Contract, as NFG contends.
 
 
 53
 The ruling of the PSC Order on this issue, set forth supra at note 2, included a statement of NFG's belief that the PSC's disapproval of the Contract "would enable [NFG] to rescind the [Contract], in which case [NFG] might negotiate [a] more acceptable agreement[ ]." This language leaves us with the inescapable impression that the PSC Order applied to a portion of the Contract only, the price term. The PSC would hardly have referred to the possibility that NFG might rescind the Contract if the PSC believed that its Order had operated to cancel the Contract; there would have been no contract left to rescind.
 
 
 54
 Further, the PSC Order characterized the problem with the three-pipeline escalator as prospective. The conclusion of its ruling on this issue stated that "we shall not allow [NFG], in the future, to recover from its customers any charges for locally-produced gas that exceed just and reasonable charges for such gas." See supra note 2 (emphasis added). Earlier, in describing the background of the issue, the PSC Order stated:
 
 
 55
 It is apparent that the price NFG pays for local gas will remain "reasonable" only so long as the Natural Gas Policy Act of 1978 remains in effect. If the act is either repealed or modified so that it no longer applies to the local producers' wells--a distinct possibility--the contract price for local gas could escalate well beyond the equivalent price of No. 6 residual oil.
 
 
 56
 When the PSC Order was issued, the three-pipeline escalator price exceeded both the FPC escalator ceiling set by the PSC and the federal ceiling set by the NGPA. The FPC escalator ceiling in turn exceeded the federal ceiling. TGX was accordingly permitted to charge the NGPA ceiling price. In the event the federal ceiling were lifted or modified to exceed the FPC escalator ceiling, then TGX would be permitted to charge only up to the FPC escalator ceiling. See 15 U.S.C. § 3432(a) (1988) (NGPA does not prevent state from setting lower maximum price for gas than federal law allows).
 
 
 57
 In sum, we see no basis to conclude that the PSC Order operated to extinguish the Contract, and note that any ruling to that effect would raise a serious due process issue in view of TGX's lack of notice of, or participation in, the hearings that culminated in the PSC Order, and its subsequent role only as an amicus curiae in the Article 78 appeal of the PSC Order. See generally Connecticut v. Doehr, --- U.S. ----, 111 S.Ct. 2105, 2111-16, 115 L.Ed.2d 1 (1991); Zinermon v. Burch, 494 U.S. 113, 127-30, 110 S.Ct. 975, 984-86, 108 L.Ed.2d 100 (1990).
 
 
 58
 We next address the related issue whether, as the district court ruled, the Contract is nonetheless voided by the cancellation of the price term because "the contracting parties' original intent ... has been disallowed by the PSC." We disagree with the district court's ruling.
 
 
 59
 Article XV(C)(1) of the Contract, quoted earlier herein, specifically provided TGX with the option, in the event of a "governmental order" that "prohibit[ed] the sale ... of gas ... at the [three-pipeline escalator] price," to "[c]ontinue sales of gas hereunder at the price permitted by such order." Thus, the Contract clearly envisioned governmental rulings like the PSC Order, and permitted TGX to continue the Contract in the aftermath of the PSC Order at a price consistent with that order.
 
 
 60
 TGX asserts that since the enactment of the NGPA in 1978, TGX has been charging NGPA ceiling prices; i.e., "TGX billed at NGPA price levels, NFG paid at those levels and TGX accepted the payments." This substitution of NGPA prices for the three-pipeline escalator assertedly constituted an election under Article XV(C)(1). Thus, according to TGX, an NGPA price has been elected and should govern the Contract.
 
 
 61
 Neither the PSC nor NFG offer any convincing response to this position. The PSC concedes that "[i]n 1984 these NGPA ceilings again served to keep prices below the 'FPC escalator' caps." NFG contends that "appellants declined to exercise any of the options provided them under Article XV(C) of the ... Contract, presumably reasoning that their 1981, unarticulated 'election' to accept NGPA ceiling prices covered the situation."
 
 
 62
 The position that NFG attributes to TGX seems perfectly sensible to us. The parties agree that NGPA prices had been charged since at least 1981, and that the PSC Order explicitly recognized that those prices were reasonable, anticipating future difficulty only "[i]f the act is either repealed or modified so that it no longer applies to the local producers' wells." No need for a fresh election by TGX in the aftermath of the PSC Order is apparent in that situation.
 
 
 63
 Furthermore, NFG's own pleading tells a very illuminating story as to how this controversy arose. Paragraphs 26-29 of NFG's amended and supplemental complaint state:
 
 
 64
 26. Through November, 1984, [NFG] continued to pay [TGX] for production attributable to the "3-pipeline" escalator contract wells at a rate equal to the applicable ceiling price provided in the [NGPA].
 
 
 65
 27. By letter of December 5, 1984, [NFG] transmitted to [TGX] a check in payment of the September, 1984 net gas production attributable to the wells subject to the [Contract]. [NFG's] payment was based upon a price of $3.49/Mcf, an amount which was substantially less than the price that would have been payable had the [Contract] not been cancelled. The $3.49/Mcf price was derived from the pricing provision contained in a new form of gas purchase agreement (the "Rollover Contract"). The Rollover Contract replaced numerous "3-pipeline escalator" contracts which also had been cancelled by the [PSC's] October 20, 1983 Order in Case 28447.
 
 
 66
 28. By letter of December 7, 1984, [TGX] declared the payment inadequate to discharge [NFG's] obligations under the [Contract].
 
 
 67
 29. By letter of December 20, 1984, [NFG] advised [TGX] that, as a result of the position taken by the PSC in its November 15, 1984 Reply Brief in the Article 78 proceeding (namely, that PSC's December 20, 1983 "disapproval" order in Case 28447 effected the "cancellation" of the [Contract] [NFG] offered to pay for such production a price computed pursuant to the pricing provisions of the Rollover Contract (i.e. the same price that [NFG] was then paying for newly committed gas), subject to a retroactive upward adjustment, with interest, in the event that the [Contract] is ultimately determined not to have been cancelled.
 
 
 68
 NFG thus concedes that for almost a year after the PSC Order became effective, NFG continued to pay TGX for gas delivered pursuant to the Contract at NGPA ceiling prices, thus precluding any need for a fresh election by TGX to continue prices that had been effective under the Contract for years prior to the entry of the PSC Order. Further, according to NFG's recital in its pleading, the controversy between NFG and TGX was precipitated by NFG's effort in December 1984 to impose payment at "an amount which was substantially less than the price that would have been payable had the [Contract] not been cancelled"; i.e., a price "substantially less" than the existing NGPA ceiling price. The assertion that the Contract had been cancelled was based not upon any provision in the PSC Order, by then a year old, but rather upon an assertion in a November 1984 reply brief by the PSC in the Article 78 proceeding that the "disapproval" stated in the PSC Order had cancelled the Contract. NFG's offer of a "retroactive upward adjustment, with interest, in the event that the [Contract] is ultimately determined not to have been cancelled" does not change the essentials of the narrative. To say the least, we do not derive from this recital the conclusion that TGX has waived an election to proceed at NGPA ceiling prices, and must be estopped from making a belated election.
 
 
 69
 For all the foregoing reasons, we conclude that the effect of the PSC Order was a prospective prohibition against the operation of the three-pipeline escalator, that the parties' course of conduct in the aftermath of the PSC Order constituted an election pursuant to Article XV(C)(1) of the Contract to continue thereunder at the NGPA ceiling price, and that the PSC Order did not operate to invalidate the entire Contract.
 
 
 70
 D. Collateral Bar.
 
 
 71
 Finally, NFG and the PSC argue that TGX is barred from litigating the Contract issues because of its participation in the Article 78 proceeding as an amicus curiae. NFG and PSC are not overly precise in stating whether they are advancing arguments of res judicata (claim preclusion) or collateral estoppel (issue preclusion), see Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984). The outcome is the same, however, under either analysis.
 
 
 72
 "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra, 465 U.S. at 81, 104 S.Ct. at 896; see 28 U.S.C. § 1738 (1988). Under New York law:
 
 
 73
 "[T]he doctrines of res judicata and collateral estoppel are applicable to give conclusive effect to the quasi-judicial determinations of administrative agencies ... when rendered pursuant to the adjudicatory authority of an agency to decide cases brought before its tribunal employing procedures substantially similar to those used in a court of law."
 
 
 74
 Staatsburg Water Co. v. Staatsburg Fire Dist., 72 N.Y.2d 147, 152-53, 527 N.E.2d 754, 756, 531 N.Y.S.2d 876, 878 (1988) (quoting Ryan v. New York Tel. Co., 62 N.Y.2d 494, 499, 467 N.E.2d 487, 489-90, 478 N.Y.S.2d 823, 825-26 (1984)).
 
 
 75
 The precise issue presented here, of course, is TGX's participation as an amicus curiae in an Article 78 proceeding that reviewed the administrative determination of the PSC. Appearance as an amicus is generally insufficient to bind a party to judgment. See Kerr-McGee Chem. Corp. v. Hartigan, 816 F.2d 1177, 1181 (7th Cir.1987) (citing cases and commentary). On the other hand, "a non-party [such as an amicus] to an action can be bound by the determination of issues decided in that action if it 'controls or substantially participates in the control of the presentation on behalf of a party.' " United States v. Davis, 906 F.2d 829, 833 (2d Cir.1990) (quoting Restatement (Second) of Judgments § 39 (1982)).
 
 
 76
 TGX's mere participation as an amicus curiae in the Article 78 proceeding does not establish that it significantly controlled NFG's conduct of that litigation. In fact, NFG's own conduct at that time suggests an agenda at cross-purposes with TGX. NFG indicated to the PSC, prior to the PSC Order affecting the Contract, NFG's apparent belief "that [the PSC's] disapproval would enable [NFG] to rescind the contracts, in which case [NFG] might negotiate more acceptable agreements." See supra note 2. NFG took pains not to inform TGX of this belief in NFG's letter notifying TGX of the PSC Order by deleting the quoted language from an extract of the PSC Order, even though the language appeared in the middle of a paragraph quoted in the letter. Furthermore, as discussed supra, NFG seized upon a position taken by the PSC in a reply brief in the Article 78 proceeding to demand that TGX, NFG's postulated ally in the litigation, reduce its gas prices below the NGPA ceiling with which NFG and TGX had complied for several years. In addition, the instant lawsuit, indicating clear adversity between NFG and TGX, was initiated by NFG in November 1984, during the pendency of the Article 78 proceeding.
 
 
 77
 Given these clear signs that NFG was pursuing a course adverse to TGX's interests prior to and during the Article 78 proceeding, TGX can hardly be said to have controlled NFG's conduct of that proceeding. Furthermore, we are reminded that preclusion principles must not be applied "mechanically." Staatsburg Water Co., 72 N.Y.2d at 153, 527 N.E.2d at 756, 531 N.Y.S.2d at 878; see also Vreeland v. Zoning Bd. of Appeals, --- A.D.2d ----, ----, 572 N.Y.S.2d 808, 809 (3d Dep't 1991). "Instead, the analysis requires consideration of 'the realities of litigation.' " Staatsburg Water Co., 72 N.Y.2d at 153, 527 N.E.2d at 756, 531 N.Y.S.2d at 878 (quoting Gilberg v. Barbieri, 53 N.Y.2d 285, 292, 423 N.E.2d 807, 809, 441 N.Y.S.2d 49, 51 (1981)). The switched allegiances and altered postures of the parties in the two litigations argue strongly against application of res judicata or collateral estoppel in this case. In the Article 78 proceeding, NFG was the plaintiff and the PSC the defendant, while TGX was an amicus purportedly allied with NFG. Here, NFG is the plaintiff and TGX the defendant, with the PSC intervening as a plaintiff aligned with NFG.
 
 
 78
 We conclude that TGX's participation as an amicus curiae in the Article 78 proceeding does not preclude TGX from challenging the PSC Order in this litigation.
 
 Conclusion
 
 79
 The judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable Joseph T. Sneed, Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation
 
 
 [1]
 On January 1, 1981, Paragon assigned its interest in the Contract to TGX
 
 
 [2]
 The PSC framed the issue as "what steps to take to 'transform' the three-pipeline escalator into an acceptable one," and then stated:
 Staff's proposal that we effectively rewrite the contracts to include a ceiling on gas cost recoveries may not comport with § 110(4). The statute provides as follows:
 All written contracts and all arrangements, hereafter made, effected through corporate resolutions or otherwise, and verified summaries of all unwritten contracts and arrangements, including such contracts and arrangements with any affiliated interest as hereinbefore defined, for the purchase of electric energy, gas (natural or manufactured or a mixture of both), and/or water before the same shall be effective, shall first be filed with the commission, and no charge for such electric energy, gas, and/or water whether made pursuant to contract or otherwise, shall exceed the just and reasonable charge for such electric energy, gas and/or water. In any proceeding to determine the reasonable cost of any such electricity, gas or water so sold and delivered or to be delivered to such purchaser the burden of proof shall be on the utility company purchasing the same. If it be found that any such contract or arrangement is not in the public interest, the commission, after investigation and hearing, is hereby authorized to disapprove such contract or arrangement.
 We have found the current local production contracts to be unacceptable, and we conclude that the better course is simply to disapprove the contracts. NFG appears to believe that such disapproval would enable it to rescind the contracts, in which case it might negotiate more acceptable agreements [emphasis added]. Regardless of what the company does, however, our disapproval of the contracts constitutes notice that we shall not allow it, in the future, to recover from its customers any charges for locally-produced gas that exceed just and reasonable charges for such gas.
 
 
 [3]
 On February 22, 1990, TGX commenced a chapter 11 bankruptcy reorganization proceeding in the United States Bankruptcy Court for the Western District of Louisiana. By order of the bankruptcy court, this litigation was exempted from the automatic stay provision of 11 U.S.C. § 362 (1988)
 
 
 [4]
 N.Y.Pub.Serv.Law § 110(3) (McKinney 1989) provides:
 No management, construction, engineering or similar contract, hereafter made, with any affiliated interest, as hereinbefore defined, shall be effective unless it shall first have been filed with the commission, and no charge for any such management, construction, engineering or similar service, whether made pursuant to contract or otherwise, shall exceed the reasonable cost of performing such service. In any proceeding to determine the reasonable cost of such charge or service the burden of proof shall be on the company. If it be found that any such contract is not in the public interest, the commission, after investigation and a hearing, is hereby authorized to disapprove such contract.
 
 
 [5]
 It should be noted that Republic Light was cited disapprovingly in Lundy, see 17 N.Y.2d at 381 n. 3, 218 N.E.2d at 279 n. 3, 271 N.Y.S.2d at 223 n. 3, but not with respect to this issue